# In the United States Court of Federal Claims

No. 06-613 C
(January 12, 2007)[1]

## UNPUBLISHED

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| PACIFIC HELICOPTER TOURS, INC., | * * | Post-Award Bid Protest; Best Value Negotiated Procurement; |
| *Plaintiff*, | * * | Transport of Department of Defense Personnel; Air Mobility |
| v. | * * | Command Certification; Timeliness of Challenge to Terms |
| THE UNITED STATES, | * * | of Solicitation; Contract Administration; Proposal |
| *Defendant*, | * * | Analysis. |
| CROMAN CORPORATION, | * * | |
| *Intervenor-defendant.* | * | |
| * * * * * * * * * * * * * * | * | |

*David M. Nadler*, with whom were *Joseph R. Berger* and *Justin A. Chiarodo*, Washington, D.C., for plaintiff.

*Joan M. Stentiford*, United States Department of Justice, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Bryant G. Snee*, Assistant Director, Washington, D.C., for defendant.

*Eric J. Marcotte*, with whom were *Scott A. Schipma* and *Nathan C. Guerrero*, Washington, D.C., for intervenor-defendant.

---

[1]/  This opinion was issued under seal on November 28, 2006.  Pursuant to ¶ 3 of the ordering language, the parties identified proprietary material subject to deletion on the basis that the material was protected/privileged.  Brackets identify the material deleted.

_____

## OPINION

_____

**Bush,** *Judge*

        This post-award bid protest action is before the court following cross-motions for judgment on the administrative record, filed under Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC).  Plaintiff Pacific Helicopter Tours, Inc. (plaintiff, PHT), is a small, minority-owned, women-owned Hawaii corporation based on Maui, Hawaii.  PHT has provided specialized helicopter aviation services to the Hawaiian Islands for more than thirty years.  In this lawsuit, filed September 1, 2006, plaintiff protests a decision by the United States Department of the Navy, Naval Air Systems Command (Navy, the agency) to award a contract for commercial helicopter services to Croman Corporation (intervenor, Croman).  Work under the challenged contract will support the Navy's operations at the Pacific Missile Range Facility (PMRF) based at Barking Sands, Kauai, Hawaii, and will replace the operations support tasks formerly performed by the Navy's H-3 Squadron.  The H-3 Squadron, which was decommissioned by the Navy at the end of Fiscal Year 2006, primarily performed target launch, weapon and target recovery, explosive ordnance and demolition operations, and extended range visual surveillance services at the PMRF.  As a disappointed bidder on the contract to replace those services, PHT complains that award to Croman was arbitrary and capricious, because that company cannot legally perform critical aspects of the work sought by the Navy.  PHT asks the court to enjoin the award to Croman, and to order the agency to resolicit the contract in a manner that complies with federal law.

        The administrative record (AR) in this matter was filed on September 20, 2006, and plaintiff moved for judgment on the administrative record on October 10, 2006.  The United States (defendant) and Croman (collectively, defendants) filed cross-motions on October 23, 2006.  The motions have been fully briefed. PHT responded to defendants' motions on October 30, 2006, and Croman and the government replied on November 3, 2006.  Discovery was not requested by the parties.  Oral argument was heard on November 8, 2006.  For the reasons that follow, the court finds that the award to intervenor was neither arbitrary, capricious, an abuse of discretion, nor otherwise contrary to law.  Plaintiff's

2

motion for judgment on the administrative record is denied, and defendants' cross-motions are granted.

## BACKGROUND

On July 29, 2005, the Navy issued Request for Proposals No. N00019-05-R-0033 (Solicitation). AR at 165. The Solicitation offered an Indefinite Delivery/Indefinite Quantity (ID/IQ) contract, with a five year period of performance comprised of one base year and four option years. *Id.* at 83. The contract was to be set aside for small businesses, and was classified under North American Industrial Classification System (NAICS) Code[2] 481211, "Nonscheduled Chartered Passenger Air Transportation."[3] *See id.* at 93. The Solicitation described the work sought by the agency as follows:

> *provide to the United States Navy . . . a wide variety of airborne capabilities, through the use of privately owned and operated aircraft, to include but not limited to training assistance, supply, and support for shipboard and aircraft groups and personnel operating in the Hawaiian Operating Area (OPAREA). The*

---

[2] NAICS codes are used by governmental agencies, and the United States Small Business Administration (SBA), to establish size standards to determine the entities which qualify as small businesses for preferences or eligibility in government procurements. *See Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 475 n.1 (2006). The United States Office of Management and Budget (OMB) assigns NAICS codes to various industry sectors, and SBA determines which firms qualify as small businesses in accordance with those codes, "to assure that a fair proportion of government contracts for goods and services are performed by such entities in each industry category." *Id.* at 476 (citing 15 U.S.C. §§ 637(b)(6), 644(a) (2000)). To do so, SBA specifies the maximum number of employees, or the maximum annual receipts, which a company may have in order to qualify as a small business within a particular code. *Id.* (citing 13 C.F.R. § 121.201 (2006)); *see also United Enter. & Assocs. v. United States*, 70 Fed. Cl. 1, 7 n.12 (2006). Then, according to SBA regulations, procuring agencies specify the NAICS code and accompanying size standard applicable to each federal procurement in which small business status is required or preferred. *Advanced Systems Technology*, 69 Fed. Cl. at 476; 13 C.F.R. § 121.401 (2006).

[3] The initial Sources Sought Announcement, issued by the Navy on May 28, 2004, referenced NAICS code 488190, "Other Support Activities for Air Transportation." AR at 4. The NAICS code was later changed to 481211 on the recommendation of the SBA. Plaintiff attributes this change to the fact that "the transport of passengers was integral to the procurement." Pl.'s Mot. at 5 (citing AR at 12-13, 36-37).

> *contractor shall primarily operate aircraft from Barking Sands,*
> *Kauai, HI.*

*Id.* at 199.  The Solicitation's Contract Line Item Number Descriptions and an Acquisition Plan published in conjunction with the Solicitation explained that the work would entail target launch and recovery, airborne firefighting, visual surveillance, ordnance transport, and passenger transport.  *See id.* at 202, 86-87. The Acquisition Plan explained that "[s]tart-up time (8 weeks) ha[d] been allowed for a new contractor to configure its aircraft with equipment and to obtain training prior to providing required services."  *Id.* at 85; *see also id.* at 93 ("The contractor will be given up to 60 days after award for phase into full performance.").  The Solicitation also stated that the contract would commence on the day of award.  *Id.* at 220.

The Solicitation set forth several certification standards that offerors were required to meet to qualify for award.  First, the Solicitation mandated that all proposed aircraft be listed on Federal Aviation Administration (FAA) airworthiness certificates "applicable to the type of tasks that [would] be performed during the period of performance" of the contract.  *Id.* at 206 (stating that "for aircraft operations in which 14 CFR Part 135 and 133 operations are stipulated or required, aircraft must be certified with an FAA Standard Category airworthiness certificate").  More specifically, because the proposed work involved the retrieval of Navy projectiles from the ocean, the agency required FAA certification under 14 C.F.R. Part 133.  *Id.* at 271.  Part 133 regulations address external-load operations. 14 C.F.R. § 133.1 (2006).  Because the work required also included the transport of Navy personnel, certification under 14 C.F.R. Part 135 was required.  AR at 271. The regulations included in that section address commuter operations.  14 C.F.R. § 135.1 (2006).

Most importantly to this protest, the Solicitation stated that "[a]ll aircraft shall be operated in accordance with all applicable Government aeronautical regulations, including USN, USAF, and local military flying directives . . . .  The contractor will comply with all DoD requirements for operation of civil aircraft in support of military operations."  AR at 207.  As a part of that general policy, the Solicitation required offerors to be certified by the United States Department of Defense (DOD) Air Mobility Command (AMC), under the terms set forth at 32 C.F.R. § 861 (2006).  *Id.* at 275.  The Solicitation emphasized the importance of AMC certification, and stated a clear deadline for the receipt of certification:

> *The Offeror must posses[s] Air Mobility Command (AMC) certification as per 32 CFR 861 to provide passenger transport in the Hawaiian theater using passenger aircraft. The Offer[or] must provide a copy of the actual AMC certificate. If the offeror does not currently possess AMC certification for the services to be provided under this contract, provide a plan of action to obtain certification prior to 1 November 2005 or 60 days after contract award whichever occurs first.*

*Id.* The Acquisition Plan also referenced these requirements, stating that

> *[t]he contractor will operate under FAA Part 135, or Civilian Aviation Authority equivalent, and must be AMC certified prior to contract award to support utility/transport missions. The contractor's aircraft must be equipped in accordance with current FAA regulations and other agency regulations as applicable.*

*Id.* at 85.

Section M of the Solicitation, titled "Evaluation Factors for Award," set forth the method by which the agency planned to evaluate proposals:

> *One offeror will be selected on the basis of its proposal being the best value to the Government, all factors considered. Prospective offerors are advised that a proposal meeting the solicitation requirements with the lowest price <u>may not</u> be selected if award to a higher cost offeror is determined to be more advantageous to the Government.*
>
> ****
>
> <u>*Evaluation Criteria*</u>
>
> *All proposals that meet the pre-requisite requirements will be evaluated for compliance with the terms, conditions and requirements set forth by the solicitation. Proposals will be evaluated using the factors listed below. Experience is more important than Technical or Past Performance. Technical and Past performance are equally important. Price is less important than any of the other factors. The combination of the non-price factors is significantly more important than price.*
>
> ****

5

*The proposal must demonstrate to the Government's satisfaction that the offeror will provide a program that will ensure the successful accomplishment of the Performance Work Statement (PWS), overall program objectives, and the potential to meet the solicitation requirements.*

*Proposal information provided for one factor may be used to assess other factors if the Government considers it appropriate.  In addition, the offeror's technical proposal will be reviewed to determine if it is consistent with the price proposal and reflects a clear understanding of the scope of work necessary to meet the solicitation requirements.*

*For the technical factor, a proposal rating and proposal risk will be assigned.  The proposal rating will depict how well the proposal will meet the solicitation requirements.  The proposal risk will address potential impacts of the proposed approach on performance, schedule, and cost in achieving solicitation requirements and program objectives.*

*For Past Performance and for Experience, a separate performance risk rating will be assigned.  This risk rating will address the probability of the offeror successfully accomplishing the requested effort based on the offeror's (including subcontractors' and/or team members') relevant past performance and systemic improvement, or demonstrated experience.  Under Past Performance, the Government will evaluate how well an offeror has performed similar work before.  Under Experience, the Government will evaluate whether, and to what extent, an offeror has performed similar work before.*

*****

*The rating and risk definitions are provided in Section M for ratings standards.  Offerors are advised that during the evaluation process, subfactors that receive a "Marginal" or "Unsatisfactory" rating or "High" risk may have a disproportionate impact on the overall factor rating or risk.  A deficiency resulting in an "Unsatisfactory" proposal rating for any subfactor may result in a factor rating of "Unsatisfactory" and the entire proposal found unacceptable and eliminated from the competition.  A risk assessment of "High" in any sub factor may also result in the entire proposal being found unacceptable and eliminated from the competition.*

6

*SPECIFIC CRITERIA*

A.   *Experience* - *The Government will evaluate the offeror's, and (if applicable), its principal subcontractors' and critical team members' demonstrated relevant experience on the basis of its breadth and depth of experience performing the type of work required to meet program objectives. Particular emphasis will be placed on the offeror's experience in coordinating with Government program and contracting teams, managing subcontractors, management of assets and resources to ensure successful completion of missions, and utilization of qualified personnel (including the use of FAA certified pilots) for contract performance.*

B.   *Technical* - *The Government will evaluate the proposal to determine the offeror's understanding of, approach to, and ability to meet solicitation requirements. The offerors technical approach will be evaluated for the breadth and depth of understanding of the complexity of each type of mission addressed. Particular emphasis will be placed on the offeror's possession of or plan of action to obtain AMC certification, use of GFE in the missions such as the pole, basket, fire fighting equipment and launch mission; as well as the ability to meet or exceed aircraft performance characteristics (e.g., speed/altitude, time on station, configuration/special equipment, and internal capacity), the proposed management of scheduled and unscheduled maintenance and impact to the fleet. Emphasis will also be placed on proposed pilot and crew FAA qualifications and availability to meet mission requirements.*

C.   *Past Performance* - *The Government will evaluate the offeror's and (if applicable) its principal subcontractors' and critical team members' demonstrated past performance in delivering quality products and in meeting technical, cost, and schedule requirements on similar programs. Problems not addressed by the offeror will be considered to still exist. However, consideration for discounting problems may be given when those problems are addressed through demonstrated systemic improvement.*

D.   *Price* - *Each offeror's price proposal shall be evaluated to*

7

*determine whether it is complete, consistent and reasonable with the offeror's technical approach, reflects a clear understanding of the solicitation requirements and contains no material imbalances. Unreasonable prices or unbalanced or inconsistencies between the Technical and Price proposals may be assessed as proposal risk under the Technical factor. An offeror's proposal is presumed to represent his best efforts to respond to the solicitation. Any inconsistency, whether real or apparent, between promised performance and cost/price should be explained in the proposal. For example, if the intended use of new and innovative techniques is the basis for an abnormally low estimate, the nature of these techniques and their impact on price should be explained. In its evaluation, the Government may use commercial published data, same or similar DoD contracts, Government estimates, industry standards, DCAA audit information, or other information as deemed appropriate by the Government.*

*For evaluation purposes only, the total price to the Government will be considered the total evaluated price as the sum of all the priced CLINs for the Base Contract period and all option years.*

*Id.* at 279-81.

The Navy received six proposals in response to the Solicitation. *See id.* at 1066. After preliminary evaluations, plaintiff's proposal received the most favorable ratings. *Id.* at 1067. The price offered by PHT, however, was higher than that from Croman, and it exceeded the Navy's Independent Government Estimate (IGE) for the work. For those reasons, the agency concluded that it could not justify the payment of a price premium to PHT in exchange for its superior Technical and Experience ratings. *Id.* at 1071. The Navy then determined that the proposals from PHT and Croman were within the competitive range, and opened discussions with those offerors to allow further development of proposals. *Id.* The proposals were subsequently re-evaluated. At that time, Croman's proposal received an Experience rating of Satisfactory/Low Risk, and PHT's proposal received an Experience rating of Highly Satisfactory/Low Risk.[4] *Id.* at 1215-16.

---

[4]/ Notably, these ratings did not comport with the directions set forth in Section M of the
(continued...)

Croman's Technical proposal was rated Satisfactory/Low Risk, and PHT's Technical proposal was rated Highly Satisfactory/Low Risk.[5]  *Id.* at 1215-17.  The agency's selection committee then briefed the Navy's Source Selection Authority (SSA), Ms. Carol Tisone, on its findings.  *Id.* at 1220 *et seq.*  The committee []

[].

*Id.* at 1235.  Shortly thereafter, the agency's Source Selection Advisory Council (SSAC) recommended an award to Croman.  *Id.* at 1243.  The SSA concurred with that recommendation, explaining in a Source Selection Decision Memorandum that, [].  On October 19, 2005, the Navy awarded the contract to Croman.

After PHT learned of the award, plaintiff requested a debriefing regarding the Navy's decision.  *Id.* at 1302.  On November 2, 2005, defendant informed PHT that although its proposal had received the most favorable Experience and Technical ratings, the government had awarded the contract to Croman based on its lower price.  *Id.* at 1334 *et seq.*  Ten days later, on November 12, 2005, PHT filed a bid protest before the United States Government Accountability Office (GAO).  *See id.* at 1349.  Plaintiff argued that Croman was ineligible for award and should have been disqualified from the competition because it had not met the Solicitation's AMC certification requirement.  *Id.*  PHT pointed out, correctly, that Croman was not AMC certified at the time of award, and that it would not become eligible for certification within the time frame set forth in the Solicitation.  *Id.*  To show that the lack of certification disqualified Croman from competition, PHT highlighted the Solicitation's provision that "[c]ontractor must . . . satisfy DOD quality and safety requirements as described in 32 CFR Part 861, Section 861.3," and the Solicitation's "General Instructions," which stated that

> *[t]he Offeror must posses[s] Air Mobility Command (AMC) certification as per 32 CFR 861 to provide passenger transport in the Hawaiian theater using passenger aircraft.  The Offer[or] must*

---

[4](...continued)
Solicitation, titled "Evaluation Factors for Award."  The Solicitation stated that a performance risk rating would be assigned regarding each offeror's Experience, but did not mandate assignment of a proposal rating.  *See* AR at 280.

[5]/  The Navy also assigned Past Performance ratings to both proposals.  Because those ratings are not challenged by PHT, they will not be summarized here.

> *provide a copy of the actual AMC certificate. If the offeror does*
> *not currently possess AMC certification for the services to be*
> *provided under this contract, provide a plan of action to obtain*
> *certification prior to 1 November 2005 or 60 days after contract*
> *award whichever occurs first.*

AR at 242, 275.  Plaintiff also pointed to the Solicitation's statement that, as a part of the agency's evaluation of the Technical aspects of a proposal, "[p]articular emphasis [would] be placed on the offeror's possession of or plan of action to obtain AMC certification."  *Id.* at 280.  As a result of PHT's protest, award to Croman was suspended in accordance with 31 U.S.C. § 3553(d) (2000).  *See id.* at 1362.  The Navy did not override the suspension based on urgent and compelling circumstances.  Instead, defendant cancelled the award to Croman and announced its intent to revise the Solicitation.  GAO then dismissed PHT's protest as academic.  *Id.* at 1383.

On January 18, 2006, the Navy revised the Solicitation and incorporated a number of changes to the original terms of that document.  *Id.* at 1635.  The change most relevant to this lawsuit is reproduced below:

> *Under subparagraph 5.3 Aircraft Availability/Reliability,*
> ***DELETE*** *in its entirety and* ***SUBSTITUTE*** *with the following:*
>
> *"5.3 Aircraft Availability/Reliability: The Offeror must posses[s]*
> *Air Mobility Command (AMC) approval as per 32 CFR 861 to*
> *provide passenger transport in the Hawaiian theater using*
> *passenger aircraft. The Offeror must provide a copy of the actual*
> *AMC Certification. If the offeror does not currently possess AMC*
> *approval for the services to be provided under this contract, **the***
> ***offeror must demonstrate its ability to receive AMC approval***
> ***after contract award through the submittal of a completed AMC***
> ***Form 207, DOD Statement of Intent, which is required by***
> ***Department of Defense (DOD) Commercial Air Carrier***
> ***Program. This form may be obtained on AMC's webpage, http://***
> ***public.amc.af.mil/business/a34b/.***

AR at 1642, 1653 (emphasis in original).  The revised Solicitation explained that, as part of the agency's Technical evaluation, "[i]f an offeror lack[ed] current AMC approval, its submission of the AMC Form 207, *DOD Statement of Intent*, [would] be evaluated to assess the likelihood of obtaining approval."  *Id.* at 1643, 1655.

Revised proposals were submitted in response to the Solicitation, and on March 15, 2006, the Navy notified PHT that it had been eliminated from the competition because it had failed to provide a Standard Airworthiness Certificate for its proposed Bell 412 (N412JH) medium lift aircraft. *Id.* at 2135. This prompted a second protest before the GAO, filed by plaintiff on March 31, 2006. *See id.* at 2857-74. In that protest, PHT argued that its exclusion from the competition was improper because, although it had not submitted a certificate for its medium lift aircraft, it had submitted certificates for two other helicopters. Plaintiff contended that documentation regarding the other two aircraft was sufficient under the terms of the Solicitation. *Id.* As with the first protest, the procurement was suspended under 31 U.S.C. § 3553(c). Again, the Navy did not override the suspension based on urgent and compelling circumstances. After GAO advised the Navy that PHT's protest would likely be sustained, the Navy reinstated PHT into the competition. *See* AR at 2875. The GAO then dismissed this second protest as academic, and the evaluation of proposals was completed with PHT among the offerors eligible for award.

The record shows that Croman's ratings improved significantly after evaluation of the revised proposals. Intervenor's Experience rating increased from Satisfactory/Low Risk to Very Low Risk. *Id.* at 3410. PHT, in contrast, received a Low Risk rating on the Experience factor, as it had done in the initial evaluation. *Id.* at 3413. The Navy also []. In Technical evaluations, Croman's score improved by two levels, from Satisfactory/Low Risk to Outstanding/Low Risk. *Id.* at 3419. PHT's Technical rating also improved, from Highly Satisfactory/Low Risk to Outstanding/Low Risk. *Id.* at 3421.[6] Thus, after the second round of evaluations, Croman and PHT were rated equally under the Technical factor, but Croman was rated more favorably in Experience. At that time, Croman offered a best and final contract price of $58,617,566. PHT, on the other hand, had lowered its price significantly, and proposed to fulfill the contract for $56,310,730. *Id.* at 3506. Croman's price therefore exceeded PHT's price by approximately 4%, or $2.3 million.

On July 6, 2006, the Navy informed offerors that Croman was the apparently successful offeror on the contract. *Id.* at 3525-30. One week later, PHT filed a

---

[6]/ The Navy also assigned a Past Performance rating to each proposal. Because those ratings are not challenged by PHT, they will not be summarized here.

size protest with the SBA, arguing that Croman was ineligible for the small business set-aside award. *Id.* at 3543. Plaintiff claimed that Croman was improperly affiliated with its proposed subcontractor, Computer Sciences Corporation (CSC), a large business. PHT contended, specifically, that Croman planned to rely on CSC to perform a large percentage of the work required by the Solicitation, in violation of 13 C.F.R. § 121.103(h)(4) (2006), a regulation known as the ostensible subcontractor rule.[7] AR at 3543-51. The SBA rejected PHT's argument regarding Croman's status as a small business. *Id.* at 3691. In a Size Determination issued on July 31, 2006, the SBA explained that Croman was eligible for a small business set-aside award because CSC would be "performing on CLINs which are valued at only 3% of the contract amount." *Id.* at 3695 (Size Determination File Number 6-2006-058).

On August 4, 2006, the Navy awarded Contract No. N00019-06-D-0027 (the Contract) to Croman. *Id.* at 3702. In a debriefing on August 10, 2006, the Navy advised plaintiff that, although PHT had submitted the lowest price during the second round of submissions, it now stood second to Croman in non-price proposal evaluations, and that the government had decided to pay a small price premium to secure the better value offered by Croman. *Id.* at 3715 *et seq.* Five days later, PHT protested the award to the GAO. Once again, performance on the contract was suspended under 31 U.S.C. 3553(d). *Id.* at 3754. Again, the Navy chose not to

---

[7]/ The Code of Federal Regulations provides that

> [a] contractor and its ostensible subcontractor are treated as joint venturers, and therefore affiliates, for size determination purposes. An ostensible subcontractor is a subcontractor that performs primary and vital requirements of a contract, or of an order under a multiple award schedule contract, or a subcontractor upon which the prime contractor is unusually reliant. All aspects of the relationship between the prime and subcontractor are considered, including, but not limited to, the terms of the proposal (such as contract management, technical responsibilities, and the percentage of subcontracted work), agreements between the prime and subcontractor (such as bonding assistance or the teaming agreement), and whether the subcontractor is the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for that solicitation.

13 C.F.R. § 121.103(h)(4) (2006).

override the suspension based on urgent and compelling circumstances.  On August 29, 2006, PHT withdrew its GAO protest and filed suit in the Court of Federal Claims.

## DISCUSSION

## I.    Jurisdiction

As stated, this is a post-award bid protest action.  There is no question that the Tucker Act provides the United States Court of Federal Claims with bid protest jurisdiction in actions filed after December 31, 1996.  28 U.S.C. § 1491(b)(1)-(4) (2000); *Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8, 16 (2005); *ViroMed Labs., Inc.  v. United States*, 62 Fed. Cl. 206, 211 (2004); *see also Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1300 (Fed. Cir. 2001); *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 268-69 (2004).  The statute explicitly provides that this court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1); *see Asia Pacific*, 68 Fed. Cl. at 16; *Hunt Building*, 61 Fed. Cl. at 269 (both quoting 28 U.S.C. § 1491(b)(1)).  "This statute further provides that the Court of Federal Claims 'shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.'" *Asia Pacific*, 68 Fed. Cl. at 16 (quoting 28 U.S.C. § 1491(b)(1)).  Accordingly, this court has subject matter jurisdiction to adjudicate PHT's post-award bid protest.  *See id.* at 16-17.

## II.    Standard of Review

### A.    Judgment on the Administrative Record

PHT, Croman, and the United States have filed cross-motions for judgment on the administrative record, under RCFC 52.1.[8]  The standard for evaluating such

---

[8]/  The rule governing the procedure for motions for judgment on the administrative record was formerly numbered RCFC 56.1.  On June 20, 2006, the rule was renamed, and

(continued...)

motions is similar, but not identical, to that used to decide a motion for summary judgment under RCFC 56.  *Info. Sciences Corp. v. United States*, 73 Fed. Cl. 70, 97-98 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005)).  It is beyond cavil that, on a traditional motion for summary judgment, the court must inquire "whether the moving party has proven its case as a matter of fact and law or whether a genuine issue of material fact precludes judgment."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A Rule 52.1 motion, by contrast, calls for a more narrow review of whether, given the disputed and undisputed facts, the plaintiff has met its burden to show that a challenged decision was not in accordance with the law.  *Id.*; *see also Bannum*, 404 F.3d at 1357.  "[T]wo principles commonly associated with summary judgment motions– that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences be weighed in favor of the non-moving party . . . are inapplicable to a motion for judgment on the administrative record . . . ."  *Int'l Outsourcing Servs., L.L.C. v. United States*, 69 Fed. Cl. 40, 45 (2005) (citing *Bannum*, 404 F.3d at 1356-57).  In other words, under Rule 52.1,

> the existence of a fact question neither precludes the granting of a motion for judgment nor requires this court to conduct a full blown evidentiary proceeding.  Rather, such fact questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [this court] were conducting a trial on [that] record."

*Id.* at 45-46 (quoting *Bannum*, 404 F.3d at 1357).

## B.     Bid Protest Review

It is well settled that "this court's review of an agency's decision regarding a contractual solicitation or award takes place in accord with standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706."  *Asia Pacific*, 68 Fed. Cl. at 19; *ViroMed Laboratories*, 62 Fed. Cl. at 211; *see also* 28 U.S.C. § 1491(b)(4) (2000) ("In any action under this [bid protest] subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.");

---

[8](...continued)
relocated to RCFC 52.1.  The substantive nature of the review of such motions was not affected by these changes.  *See Info. Sciences Corp. v. United States*, 73 Fed. Cl. 70, 97 n.29 (2006).

*Bannum*, 404 F.3d at 1351 (stating that "the trial court [first] determines whether . . . the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A)"). Accordingly, the court must determine whether the contracting agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A) (2000); *Bannum*, 404 F.3d at 1351; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000). The plaintiff bears the burden of proving the arbitrary and capricious nature of the award, by a preponderance of the evidence. *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995 (Fed. Cir. 1996); *Hunt Building*, 61 Fed. Cl. at 269. "Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts." *ViroMed Laboratories*, 62 Fed. Cl. at 212 (citing *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The court should overturn the challenged decision only if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004); *Asia Pacific*, 68 Fed. Cl. at 19 (both quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)); *see also Hunt Building*, 61 Fed. Cl. at 269. Essentially,

> [w]hen a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Banknote*, 365 F.3d at 1351 (internal quotations and citations omitted).

If it is determined that a contract was awarded in violation of APA standards, the court must then evaluate whether the plaintiff, as an unsuccessful bidder, was prejudiced significantly by the government's conduct. *Bannum*, 404 F.3d at 1353. To do so, the court is "required to make factual findings . . . from the record evidence as if it were conducting a trial on the record." *Id.* at 1357. Plaintiff again bears the burden of proof, and must "show that there was a substantial chance [plaintiff] would have received the contract award but for the

[government's] errors . . . ."  *Id*. at 1358 (internal quotations omitted).

### C.    Standing

Standing to protest a contract award in this court is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract . . . ."  *Banknote*, 365 F.3d at 1352 (quoting *Am. Fed'n of Gov't Employees, AFL-CIO*, 258 F.3d at1302).  Thus, in order to prevail in a bid protest, a claimant must provide evidence of "not only a significant error in the procurement process, but also that the error prejudiced it."  *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).  This requires evidence of a "substantial chance" that the protestor would have received the contract award, but for the alleged error or errors.  *Id.* at 1331; *see also Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed. Cir. 2001) ("To establish prejudice in an action involving an alleged statutory or regulatory violation, a protester must show that absent the error, there was a substantial chance it would have received the contract award.") (internal quotations omitted)).  The law is clear that issues of harm and prejudice must be examined at the outset of any bid protest litigation, as they are essential to the plaintiff's standing, and thus, the court's jurisdiction.  *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (holding that an inquiry into the prejudice suffered by a protestor, as a result of an error in the procurement process, must be examined prior to a review of the merits of its protest).

Here, there is no question that PHT's proposal was deemed to be in the competitive range, and that plaintiff's direct economic interest will be affected by the award to Croman.  Indeed, because PHT received the second most favorable rating of all offerors on the challenged contract, and proposed the lowest price, plaintiff had a substantial chance to win the award, but for the alleged errors in the procurement process.  For these reasons, PHT has standing to lodge this protest as a disappointed bidder on the Navy contract.  *See Information Sciences*, 73 Fed. Cl. at 94 (explaining that because the plaintiff was an interested party that had submitted a proposal determined to be within the competitive range, and because it had a substantial chance of being awarded the contract but for the alleged errors, it had standing to pursue a bid protest); *Chapman Law Firm v. United States*, 63 Fed. Cl. 519, 523 (2005); *Hunt Building*, 61 Fed. Cl. at 270-71.

## III.   Analysis

In this protest, PHT advances two overarching contentions in its effort to show that award to Croman must be overturned.  First, plaintiff contends that intervenor does not have previous work experience which is similar to that sought by the Navy, and so, the award to Croman violates a federal statute, its implementing regulation, and the terms of the Solicitation.  Second, PHT argues that the agency was unreasonable in its evaluation of proposals, and that its best value determination was therefore flawed.

### A.   Is Award to Croman Contrary to Law?

#### 1.   Has Plaintiff Lodged an Untimely Challenge to the Terms of the Solicitation?

The parties agree, and indeed, there can be no doubt, that the Solicitation required offerors to hold AMC certification.  There is likewise no question, however, that the disputed Solicitation did not include an explicit deadline by which offerors were required to obtain that certification.  Plaintiff argues that, given the absence of such a deadline, the only reasonable way to interpret the Solicitation was to conclude that offerors were required to obtain AMC certification within a reasonable amount of time, for example, the sixty days allotted for the awardee to phase into full performance readiness.  In fact, PHT argues that certification within a reasonable time is mandated by federal law. Plaintiff claims that, by awarding the contract to Croman, a company that could not obtain certification within a reasonable time, the Navy violated the terms of the Solicitation as well as the statute and regulation which set the parameters for AMC approval.  Croman and the government disagree.  Both contend that, given the Navy's deletion of a certification deadline from the Solicitation, it was clear that the agency reserved sole discretion to itself to determine whether an offeror's certification would arrive in a timely manner.  Thus, defendants contend, the award to Croman was reasonable and appropriate regardless of its AMC status.

Before arguing the merits of these claims, however, defendants unite in contending that PHT's claims regarding AMC certification are untimely challenges to the facial terms of the Solicitation.  The United States interprets PHT's claim as a contention that the Solicitation term which permitted submission of a Form 207, in lieu of a current AMC certificate, was impermissible because it made it possible

for an offeror to win the contract despite an inability to transport DOD passengers. Defendant argues that this aspect of the Solicitation was obvious, and that under the "patent ambiguity rule," PHT should have presented its challenge prior to award if plaintiff believed it contrary to law. *See* Def.'s Mot. at 8 (citing *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 513 (2006)). Similarly, Croman contends that PHT knew the Solicitation permitted award to uncertified offerors, and set no deadline for obtaining certification. Intervenor insists that it was clear that "[b]y not specifying a precise time period and <u>eliminating</u> the requirement previously mandating approval within 60 days after contract award," the Navy "reserved to itself the discretion to judge whether any needed certification would be obtained in a timely manner." Int.'s Reply at 3 (internal quotations omitted). Croman argues that the import of these terms was clear, and that to interpret the Solicitation to include a specific deadline for certification would be unreasonable. According to Croman,

> the core contention PHT seeks to advance is that no offeror, other than one already holding AMC certification was eligible for award. This view is directly counter to the terms of the RFP and could have been brought long ago. The same is true of PHT's assertion that some defined time period for obtaining certification was required.

*Id.* at 4. Finally, as a matter of policy, intervenor states that if the certification process "dragged on interminably, at no fault of the contractor, it would be absurd for the Navy to lose the benefits of the best proposal because of some arbitrary deadline. Alternatively, if a hold-up in certification threatened mission performance, the Navy could simply terminate the contract for convenience and seek alternatives." *Id.* at 3.

In support of their contentions, defendants cite the settled GAO rule that challenges to the terms of a solicitation must be lodged before proposal submission. Defendants note that this rule is often invoked, in some form, by the Court of Federal Claims. Int.'s Mot. at 13-14; Def.'s Reply at 3; Int.'s Reply at 4 (citing *Bannum, Inc. v. United States*, 60 Fed. Cl. 718 (2004); *ABF Freight Sys., Inc. v. United States*, 55 Fed. Cl. 392, 399 (2003); *N.C. Div. of Servs. for the Blind v. United States*, 53 Fed. Cl. 147, 165 (2002)). In fact, the United States argues that the GAO timeliness rule has been applied by the court to protests challenging the facial terms of a solicitation, and to those alleging that a solicitation has

erroneously applied a statute or regulation.  And as a matter of policy, the government argues that plaintiff should not be permitted to protest now, when its suit will "only interfere with the agency's ability to evaluate the contracts under the terms of the solicitation."  Def.'s Reply at 4.  Defendant insists that the protest is inappropriate because plaintiff has already protested the AMC provisions of the Solicitation once and "had every reason to have this claim considered at a time when the solicitation could have been efficiently changed if the Navy or the GAO had found that appropriate."  *Id.* at 5.

In response, PHT asserts that its claim does not challenge the terms of the Solicitation, but instead, the Navy's interpretation and application of that document.  Pl.'s Resp. at 4-6 (citing *Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 112-117 (2003)).  In fact, plaintiff contends that a challenge to the terms of the Solicitation which purport to permit contract performance without an AMC certificate would be unnecessary.  PHT explains that, "since twelve months of equivalent service in DOD transport are required by federal statute, contrary terms in the Solicitation are not binding or relevant."  *Id.* at 5.  Plaintiff concedes that the Solicitation permitted offerors to receive AMC certification after award.  PHT contends, however, that this provision was temporally limited by the fact that contract performance was to "'commence on the day of the contract award and . . . continue for a twelve month period.'"  Pl.'s Mot. at 18 (quoting AR at 1712).  PHT insists that Croman's proposal violated the latter requirement, inasmuch as Croman's lack of current certification demonstrated that "Croman could not perform all aspects of the contract as of the day of the contract award . . . ."  Pl.'s Resp. at 13-14.  According to plaintiff,

> [s]ince the contract is for a one year term and contract performance commences on the date of award, the time for reasonable receipt of the AMC approval should have been measured in days or weeks, not months.  The Navy could not award to an offeror whose AMC approval cannot be granted until months after award.  This is because that offeror would not be able to perform the PWS requirements during the contract until the approval is received, which in Croman's case would be June 2007 *at the earliest*.

Pl.'s Mot. at 18 (emphasis in original).  PHT states that it could not have known, from the text of the Solicitation, "that the Navy would interpret it to obviate the requirement for AMC approval during the term of the Contract . . . ."  Pl.'s Resp. at 7.  Thus, plaintiff contends that, at most, the Solicitation contained a latent

ambiguity which it was not obligated to challenge before award.  Finally, plaintiff points out that the GAO timeliness rule is applied sparingly in the Court of Federal Claims.

It is well settled that, in protests before the GAO, claims based upon alleged improprieties in a solicitation which are apparent before the deadline for receipt of initial proposals must be filed in advance of that deadline.  4 C.F.R. § 21.2(a)(1) (2006).  The Court of Federal Claims has adopted that rule in some circumstances. *See, e.g., ABF Freight System*, 55 Fed. Cl. at 399; *North Carolina*, 53 Fed. Cl. at 165.  There is no question, however, that the GAO timeliness rule is not binding on the court.[9]  *See Consolidated Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 624 (2005); *ABF Freight System*, 55 Fed. Cl. at 399; *Aerolease Long Beach v. United States*, 31 Fed. Cl. 342, 358, *aff'd*, 39 F.3d 1198 (Fed. Cir. 1994).  In practice, the rule is applied by the Court only in "appropriate circumstances," in which, for example, a plaintiff has acted in a manner which would be "disruptive, unfair to the other offerors [or] would serve to undermine the soundness of the federal procurement system."  *North Carolina*, 53 Fed. Cl. at 165 (citing *Pardee Constr. Co.*, B-256,414, 94-1 CPD ¶ 372, at *4 (June 13, 1994) (unpublished) (stating that GAO's "timeliness rules reflect the dual requirements of giving parties a fair opportunity to present their cases and resolving protests expeditiously without unduly disrupting or delaying the procurement process")).  The court, unlike GAO, must apply the rule sparingly, given its tension with Congress' express grant of jurisdiction to entertain bid protests filed before and after award. *See ABF Freight System*, 55 Fed. Cl. at 399 (citing 28 U.S.C. § 1491(b)).

In this case, the court agrees with plaintiff that this AMC certification dispute does not merely challenge the facial terms of the Solicitation, but instead, questions the manner in which the Navy applied arguably ambiguous provisions of that document to the proposals it received.  PHT does not argue that the absence of a certification deadline was *per se* improper, but rather, that the Solicitation included an implicit deadline by virtue of a complicated interplay in its terms.  *See*

---

[9]/ Similarly, "[w]hile [GAO] decisions are not binding on this court, this court accords deference to the Comptroller General decisions in recognition of GAO's expertise and role in the resolution of contested procurement decisions."  *N.C. Div. of Servs. for the Blind v. United States*, 53 Fed. Cl 147, 165 n.13 (2002) (citing *Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 522 (1991)).

*Overstreet Electric*, 59 Fed. Cl. at 116 (stating that "[w]hat we have here is not a disagreement over the fairness of terms of a solicitation . . . or a failure to protest recognized ambiguities in terms . . . but a disagreement on how the standards of the solicitation were interpreted and applied . . .").  In other words, this protest centers on the parties' competing interpretations of the Solicitation.

That conclusion does not, however, end the court's inquiry into the timeliness of PHT's claim.  As defendants have correctly pointed out, any time a conflict or ambiguity in the terms of a solicitation exists that is so obvious as to be "patent," an offeror is obliged to challenge it before contract award.  For that reason, any time an ambiguity in a solicitation is alleged, "the issue becomes whether the disputed provisions were patently ambiguous . . . ."  *Maint. Eng'rs, Inc. v. United States*, 21 Cl. Ct. 553, 559 (1990).  There is no question that the construction of the terms of a government solicitation essentially involves contract interpretation, and presents questions of law to be answered by the court. *Overstreet Electric*, 59 Fed. Cl. at 112 ("The interpretation of a solicitation is not a matter of *post hoc* subjective opinion but is an objective question of law."); *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 389 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004); *see also Grumman Data Systems*, 88 F.3d at 997. Whether the terms of a solicitation are ambiguous is also a question of law. *Overstreet Electric*, 59 Fed. Cl. at 112.

The principles governing contract interpretation apply with equal force to the interpretation of government issued solicitations.  *See Banknote*, 365 F.3d at 1353 n.4 (citing *Grumman Data Systems*, 88 F.3d at 997-98).  Accordingly, the court's starting point in interpreting a solicitation is the plain language of that document.  *Id.* at 1353.  If the document's language is clear and unambiguous, the court must give the language its "plain and ordinary meaning," and may not rely on extrinsic evidence to aid in its interpretation.  *Id.*; *Overstreet Electric*, 59 Fed. Cl. at 112.  The court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Banknote*, 365 F.3d at 1353; *see also Overstreet Electric*, 59 Fed. Cl. at 112.

If a solicitation is ambiguous, in that "differing constructions of the [solicitation's] plain meaning are plausible, the court must inquire whether such a discrepancy would be apparent to a reasonably prudent contractor."  *Maintenance Engineers*, 21 Cl. Ct. at 559 (citing *John G. Grimberg Co. v. United States*, 7 Cl. Ct. 452, 456 (1985)).  Such an inquiry is critical because, if the terms of a

solicitation are patently ambiguous, the non-drafting party has a duty to inquire as to their meaning. *Id.* (citing *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed. Cir. 1988)).  In other words, contractors must inquire only as to major omissions, obvious discrepancies, or manifest conflicts in a solicitation's provisions. *Id.*; *see also WPC Enter., Inc. v. United States*, 323 F.2d 874, 877 (Ct. Cl. 1963).  A "patent ambiguity," by definition, is one which is "'*so* glaring as to raise a duty to inquire.'"  *Fort Vancouver Plywood*, 860 F.2d at 414 (quoting *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed. Cir. 1987)) (emphasis in original); *Maintenance Engineers*, 21 Cl. Ct. at 560.  Further, "[i]t is not the contractor's actual knowledge, but the obviousness of the inconsistency that imposes the duty to inquire." *Maintenance Engineers*, 21 Cl. Ct. at 560 (citing *Chris Berg, Inc. v. United States*, 455 F.2d 1037, 1045 (Ct. Cl. 1972)).

Here, each party has presented a reasonable interpretation of the Solicitation. Defendants are certainly correct that the Solicitation set no specific deadline by which offerors were required to secure AMC certification.  Because the plain language of the Solicitation presents the starting point for the court's inquiry, that fact is significant. *Banknote*, 365 F.3d at 1353.  Further, as Croman has emphasized, the fact that the Navy specifically deleted the certification deadline from the original version of the Solicitation is evidence of the Navy's intent to allow itself maximum leeway with regard to the timeliness of certification.  On the other hand, the Solicitation mandated that performance was to begin upon award, and the Contract Line Items included potential passenger transport work, for which AMC certification is undoubtedly required. *See* AR at 1694-98, 1712.  When those terms are considered in conjunction with one another, the Solicitation arguably appears to include an implied deadline for receipt of AMC certification.  A reasonable inference may be drawn, from the Solicitation as a whole, that offerors were required to become certified by the time of award or a reasonable time thereafter. *See id.*  That interpretation is further bolstered by the fact that it avoids any conflict between the terms of the Solicitation and the relevant statute and regulation.

In the court's view, the fact that two reasonable and competing interpretations of the Solicitation arise from that document's terms shows that the interpretation favored by plaintiff was not "*so* glaring as to raise a duty to inquire." *Fort Vancouver Plywood*, 860 F.2d at 414.  Further, there is no evidence that PHT had outside knowledge of the Navy's interpretation before award.  In that regard, the facts presented are easily distinguished from those considered in *Blue & Gold*

22

*Fleet*, 70 Fed. Cl. at 512.  In *Blue & Gold Fleet*, the plaintiff filed a pre-award protest of a concession contract issued by the National Park Service, arguing that the agency had failed to recognize that the Service Contract Act applied to the work being procured.  *Id.*  The plaintiff claimed that, because the agency had not required proposals to comply with that statute, the proposed awardee's proposal included wage rates which would violate the Act's provisions.  The government retorted that the Act did not apply to the work being procured.  The defendant pointed out that the Department of Labor had promulgated a regulation which exempted the relevant category of contracts from the provisions of the Act, and that the procuring agency had a long-standing policy, embodied in its own regulations, of not applying the Act to its concession contracts.  *Id.* at 512-13.  When plaintiff argued that the challenged contract fell outside of those exceptions, the court noted that the plaintiff had specific previous knowledge of the agency's policy, for three reasons.  *Id.* at 513.  First, the plaintiff's existing concession contract with the Park Service did not incorporate terms of the Service Contract Act.  In addition, the agency had included a copy of applicable regulations in its prospectus, including its own regulation which exempted its concession contracts from the Act.  Finally, other regulations mandated that any prospectus applying the Act include applicable wage information, and the Park Service's prospectus did not include wage information, signifying that it would not apply the Act to the procurement.  *Id.*  The court found that, despite its awareness that the Park Service would not apply the Service Contract Act to the procurement, the plaintiff had improperly waited to protest until after another offeror's proposal had been selected.  *Id.*  The court faulted the plaintiff for not seeking clarification before proposal submission, and dismissed its claim as time-barred.  *Id.* at 513-14.

Here, unlike in *Blue & Gold Fleet*, there is no evidence that PHT knew, to any degree of certainty, that the Navy would interpret the Solicitation to permit an award to offerors that could not obtain AMC certification at, or shortly after, award.  As explained above, plaintiff has presented a reasonable alternative interpretation of the Solicitation which indicates the opposite.  Moreover, defendants have not shown that plaintiff had previous experience with the Navy to which knowledge of the agency's interpretation could be attributed.  Finally, the deletion of a specific certification deadline from the Solicitation would not have necessarily alerted PHT to the agency's intended interpretation.  *Cf. Blue & Gold Fleet*, 70 Fed. Cl. at 512-14.  For these reasons, the court disagrees with defendants' contention that PHT should have anticipated the Navy's interpretation of the Solicitation, and challenged it in advance of proposal submission.

In sum, the parties disagree on the manner in which the Solicitation was to be interpreted and applied, rather than the terms of the Solicitation themselves. The conflict in the Solicitation's terms created, at most, a latent ambiguity which PHT was not required to challenge prior to award.  Accordingly, the GAO timeliness rule and the patent ambiguity doctrine present no impediment to PHT's post-award protest.

## 2.    The Merits of PHT's Contentions

Plaintiff argues that the award to Croman violated 10 U.S.C. § 2640 (2000), and its implementing regulation, 32 C.F.R. § 861 (2006).  That statute, titled "Charter air transportation of members of the armed forces," provides, in relevant part, as follows:

> **(a) Requirements. - - (1)** The Secretary of Defense may not enter into a contract with an air carrier for the charter air transportation of members of the armed forces unless the air carrier - - . . .
>
> **(B)** has at least 12 months of experience operating services in air transportation that are substantially equivalent to the service sought by the Department of Defense . . . .

10 U.S.C. § 2640(a)(B).  Part 861 of title 32 of the Code of Federal Regulations, in turn, sets forth the criteria by which the DOD will determine whether the twelve months of experience proffered by a contractor are adequate to meet the statutory requirement.  The regulation reserves sole discretion to the DOD to assess an air carrier's compliance with the statute.  The regulation states, in relevant part, as follows:

> (e) Evaluation requirements.  The air carrier requirements stated in this part provide the criteria against which would-be DOD . . . air carrier contractors, as well as air carriers providing services on behalf of DOD, may be subjectively evaluated by DOD.  These requirements are neither all-inclusive nor inflexible in nature. They are not replacements for the certification criteria and other regulations established by the CAA.[10]  Rather, these requirements

---

[10]/  "CAA" is an abbreviation for the term "Civil Aviation Authority."  According to the Definitions section of 32 C.F.R. § 861, "[t]he CAA refers to the organization within a country

(continued...)

complement CAA certification criteria and regulations and describe the enhanced level of service required by DOD. The relative weight accorded these requirements in a given case, as well as the determination of whether an air carrier meets or exceeds them, is a matter within the sole discretion of the DOD Air Carrier Survey and Analysis Office and the CARB, subject to the statutory minimums provided in the reference in § 861.1(a).[11]

> (1) Quality and safety requirements--prior experience. U.S. and foreign air carriers applying for DOD approval in order to conduct air transportation services for or on behalf of DOD under a contract or agreement with DOD . . . are required to possess 12 months of continuous service equivalent to the service sought by DOD. In applying this requirement, the following guidance will be used by DOD authorities:

---

[10](...continued)
that has the authority and responsibility to regulate civil aviation. The term CAA is used throughout this part since these requirements are applicable to both U.S. and foreign carriers doing business with DOD. The term CAA thus includes the U.S. Federal Aviation Administration (FAA)."  32 C.F.R. § 861.3(c) (2006).

[11]/  The Commercial Airlift Review Board, or "CARB"

> provides a multifunctional review of the efforts of the DOD Air Carrier Survey and Analysis Office and is the first level decision authority in DOD on quality and safety issues relating to air carriers. Responsibilities include, but are not limited to: the review and approval or disapproval of air carriers seeking initial approval to provide air transportation service to DOD; the review and approval or disapproval of air carriers in the program that do not meet DOD quality and safety requirements; the review and approval or disapproval of air carriers in the program seeking to provide a class of service different from that which they are currently approved; taking action to suspend, reinstate, or place into temporary nonuse or extended temporary nonuse, DOD approved carriers; taking action, on an as needed basis, to review, suspend, reinstate, or place into temporary nonuse or extended temporary nonuse, an air carrier providing operational support services to DOD; and, referring with recommendations, issues requiring resolution or other action by higher authority.

32 C.F.R. § 861.5(e) (2006); *see also* 32 C.F.R. § 861.2 (2006).

(i) "12 months" refers to the 12 calendar months immediately preceding the request for DOD approval.

(ii) "Continuous" service means the carrier must have performed revenue-generating services of the nature for which DOD approval is sought, as an FAA Part 121, 125, 127, or 135 (14 CFR 121, 125, 127, or 135) air carrier . . . on a recurring, substantially uninterrupted basis.  The services must have occurred with such frequency and regularity as to clearly demonstrate the carrier's ability to perform and support sustained, safe, reliable, and regular services of the type DOD is seeking. Weekly flight activity is normally considered continuous, while sporadic or seasonal operations (if such operations are the only operations conducted by the carrier) may not suffice to establish a carrier's ability to perform and support services in the sustained, safe, reliable, and regular manner required by DOD.  The ability of a carrier to perform services of the type sought by DOD may be called into question if there have been lengthy periods of time during the qualifying period in which the carrier has not operated such services. Consequently, any cessation, or nonperformance of the type of service for which approval is sought may, if it exceeds 30 days in length during the qualifying period and depending on the underlying factual circumstances, necessitate "restarting" the 12-month continuous service period needed to obtain DOD approval.

(iii) "Equivalent to the services sought by DOD" means service offered to qualify for DOD approval must be substantially equivalent to the type of service sought by DOD.  The prior experience must be equivalent in difficulty and complexity with regard to the distances flown, weather systems encountered, international and national procedures, the same or similar aircraft, schedule demands, aircrew experience, number of passengers handled, frequency of operations, and management required.

26

There is not a set formula for determining whether a particular type of service qualifies.  The performance of cargo services is not considered to be "substantially equivalent" to the performance of passenger services, and may not be used to meet the 12 continuous months requirement for passenger services.  However, when a carrier already providing cargo services to DOD applies to carry passengers, the CARB may consider the carrier's cargo performance and experience in assessing whether a carrier is qualified to carry passengers on a specific type or category of aircraft, over certain routes or stage lengths, or under differing air traffic control, weather, or other conditions.  The following examples are illustrative and not intended to reflect or predict CARB action in any given case:

Example 1:  Coyote Air has operated commercial passenger commuter operations in the U.S. for a number of years flying a variety of twin-engine turboprop aircraft.  They have also been a DOD-approved cargo carrier, providing international cargo services using DC-10 freighter aircraft.  Coyote Air purchases a passenger version DC-10, and seeks DOD approval to provide international passenger service for DOD.  The CARB may decide that although Coyote Air has provided passenger services for 12 continuous months, those services are not substantially equivalent to those being sought by DOD.  While the carrier may have considerable operational experience with the DC-10, its commuter passenger operations are not substantially equivalent to the service now proposed--international passenger services on large jet aircraft.

Example 2:  Acme Air has been a DOD-approved cargo carrier for several years, operating domestic and international missions with MD-11 freighter aircraft.  At the same time, Acme has been performing commercial international passenger services with B-757 aircraft.  Acme Air purchases a MD-11 passenger aircraft and applies to perform

> passenger services for DOD using the MD-11.
> Assuming Acme has performed B-757 passenger
> service for 12 continuous months immediately
> preceding its application, the CARB may consider
> these passenger services substantially equivalent to
> those proposed since both involve the operation of
> large multi-engine aircraft in an international
> environment.  The CARB may also consider
> Acme's operational history with its MD-11
> freighter aircraft in determining whether the carrier
> is competent to provide MD-11 passenger service in
> the same environment.

32 C.F.R. § 861.4(e).  As indicated in the parties' briefings, the DOD's
Commercial Airlift Division Air Mobility Command (AMC) is currently
responsible for assessing the ability of commercial air carriers to qualify for
certification under 32 C.F.R. § 861.4(e).  The manner in which the AMC does so
was recently explained in the Federal Register:

> The Department of Defense Commercial Airlift Division (HQ
> AMC/A34B) is responsible for the assessment of a commercial air
> carrier's ability to provide quality, safe, and reliable airlift to the
> Department of Defense.  HQ AMC/A34B uses Air Mobility
> Command (AMC) Form 207 to acquire information needed to
> make a determination if the commercial carriers can support the
> Department of Defense.  Information is evaluated and used in the
> approval process.  Failure to respond renders the commercial air
> carrier ineligible for contracts to provide air carriers service to the
> Department of Defense.

71 Fed. Reg. 12685-01 (March 13, 2006).

### a.     Does 10 U.S.C. § 2640 Apply to the Contract?

Although defendants have agreed, from the outset of this protest, that 32
C.F.R. § 861 applies to the contract at issue, they argue that 10 U.S.C. § 2640 is
inapplicable to the current dispute.  The starting point in determining whether the
statute applies to this procurement is, of course, the plain language of the statute
itself.  *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) (stating that the
"starting point in discerning congressional intent is the existing statutory text").
By its own terms, 10 U.S.C. § 2640(a) applies to all contracts which call for "air

transportation."  Under section (j) of the statute, the term "air transportation" is to be ascribed the meaning included in 49 U.S.C. § 40102(a) (2000).  *See* 10 U.S.C. § 2640(j)(1).  Section 40102(a), in turn, defines the term "air transportation" as "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft."  49 U.S.C. § 40102(a)(5).

Here, to show that the disputed statute does apply to the Solicitation and that the award to Croman falls within the ambit of "air transportation," PHT argues that the challenged contract calls for "foreign air transportation," which is

> the transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mail by aircraft, between a place in the United States and a place outside the United States when any part of the transportation is by aircraft.

49 U.S.C. § 40102(a)(23).  The term "United States," as it is used in that definition, means "the States of the United States, the District of Columbia, and the territories and possessions of the United States, including the territorial sea and the overlying airspace."  49 U.S.C. § 40102(a)(46).  Because the "territorial sea" is "currently defined in U.S. and international law to mean a distance from the coast [up to] 12 nautical miles," plaintiff suggests that the statute "applies to transit between the shore and any point outside 12 nm[] from shore, which is exactly where the Navy ships at the Pacific Missile Range Facility will be."  Pl.'s Sur-Reply at 1 (citing 50 U.S.C. § 195 (2000)).  In the alternative, PHT asserts that because the contract will require transport between the Hawaiian islands, it also implicates the "interstate air transportation" aspect of the term "air transportation."  *Id.* at 2 (citing *Civil Aeronautics Bd. v. Island Airlines, Inc.*, 235 F. Supp. 990, 1007-08 (D. Haw. 1964), *aff'd*, 352 F.2d 735 (9th Cir. 1965) (stating that transport between major Hawaiian islands is considered to be interstate air transportation)).

In response, defendants argue that the work included in the challenged contract does not implicate foreign air transportation.  For support, defendants point to a decision by the United States Court of Appeals for the Second Circuit, *SeaAir NY, Inc. v. City of New York*, 250 F.3d 183 (2d Cir. 2001).  *See* Oral Arg. Tr. at 53.  In *SeaAir NY*, the Second Circuit was called on to interpret a number of the definitions set forth in Section 40102.  The plaintiff in that case, a seaplane touring company, attempted to show that the flights it regularly conducted qualified as "interstate air transportation," because they constituted "transportation

of passengers or property by aircraft as a common carrier for compensation . . .
between a place in . . . a State, territory, or possession of the United States and a
place in the District of Columbia or another State, territory, or possession of the
United States[.]" *Id.* at 186 (quoting 49 U.S.C. § 40102(a)(25)).  The plaintiff
argued that because its flights originated in New York, flew over the airspace of
New Jersey, and then returned to New York, they fell within the ambit of that
definition. *Id.*  The court disagreed.  Focusing on the terms "transportation" and
"between," the court noted that "transport" is commonly defined as "to carry . . .
from one place to another." *Id.*  The court then concluded that

> Congress, in devising the language of § 40102(a)(25), used the
> words "transportation" and "between" in their traditional sense of
> movement from one place to another, and intended that the
> movement be from the earth of one state to the earth, not the
> airspace, of another.

*Id.* at 187.  Because the plaintiff's charter flights both began and ended in New
York, the court held that they did not constitute interstate air transportation. *Id.*

Here, defendants ask the court to adopt the reasoning of *SeaAir NY*, and to
conclude by analogy that work at the PMRF will not constitute foreign air
transportation. *See* Oral Arg. Tr. at 53.  The United States and Croman point out,
correctly, that flights from the PMRF to ships or other landing platforms beyond
the territorial sea will not comprise movement "from the earth of one" to the "earth
. . . of another." *See SeaAir NY*, 250 F.3d at 187.  And as a general matter,
defendants argue that the statute is inapplicable because it governs contracts
"solely for the long-distance air transportation of military personnel, not to
incidental passenger transport over the short distances involved at the Pacific
Missile Range Facility . . .  involved in this procurement."  Def.'s Reply at 5.

On this particular point, the court agrees with defendants.  In accordance
with the persuasive reasoning of the Second Circuit in *SeaAir NY*, the contract
awarded to Croman does not call for foreign air transportation, because none of the
flights described in the Solicitation's Line Items will even potentially be required
to land on the "earth of another" country. *See* 250 F.3d at 187.  However, in the
court's view, while the Solicitation does not call for foreign air transportation, it
does provide for work which may accurately be described as interstate air
transportation.  The definition of the term "interstate air transportation" includes

"the transportation of passengers or property by aircraft as a common carrier for compensation . . . between a place in . . . Hawaii and another place in Hawaii through the airspace over a place outside Hawaii[.]"  49 U.S.C. § 40102(a)(25)(ii). Here, the Contract Line Items included in the Solicitation clearly anticipate travel in excess of 12 nautical miles from the shore of Hawaii, and from one location within the state to another.  *See* AR at 1694-98 (describing transport trips up to 125 miles beyond the shore of Hawaii and "to and from various locations in the Hawaiian Operating Area").  Because the court must interpret the Solicitation in context, and in a manner which gives effect to all of its terms, the hypothetical import of those Line Items must be considered.  *Banknote*, 365 F.3d at 1353. Together, these terms of the Solicitation create the possibility that the awardee may be required to conduct flights which originate from one place in Hawaii, travel through airspace over a place outside Hawaii, beyond the territorial sea, and terminate in another place within the state.[12]  Those flights will, of course, travel from the earth of one part of Hawaii, to the earth of another part of Hawaii, and so, would meet the definition of "interstate air transportation," as that term was interpreted by the Second Circuit.  *See SeaAir NY*, 250 F.3d at 187.  Because the Solicitation terms allow for the provision of interstate air transportation, the court concludes that 10 U.S.C. § 2640(a) applies to the challenged award.

> **b.**    **Do These Claims Present Matters of Contract Administration Beyond the Scope of Bid Protest Review?**

Plaintiff argues that the award to Croman violates 10 U.S.C. § 2640 and its implementing regulation, 32 C.F.R. § 861.  As explained in the previous section, Section 2640 mandates that before DOD may enter into a contract for charter air transportation, the contract awardee must possess twelve months of experience providing services which are equivalent to those sought by DOD.  *See* 10 U.S.C. § 2640(a)(B).  The cited regulation implements that rule by setting forth the specific

---

[12]/  Croman concedes that, under the Solicitation, the awardee may be asked to transport passengers "to ships outside of Hawaii's . . . territorial waters zone," but argues that in such a case, the one-way "trip could be outside Hawaii waters, in which case it would not be 'between a place in . . . Hawaii and another place in Hawaii.'"  Int.'s Reply at 11 (quoting 49 U.S.C. § 40102(a)(25)).  While the court agrees with that description of a possible scenario, the court reaches the conclusion that other scenarios as previously described by the court are equally possible and must be taken into account.

criteria used to determine whether the experience proffered by a contractor in satisfaction of that requirement is adequate, and by reserving sole discretion to decide the issue to the AMC.  *See* 32 C.F.R. § 861.4(e).  These two provisions of law work together to create one legal standard applicable to contracts which include the transport of DOD passengers.  Here, PHT argues that Croman will not meet the relevant certification criteria, and that AMC's broad discretion does not permit it to excuse a violation like the one which will result from the current award.

Before addressing the merits of those contentions, Croman argues that PHT's allegations regarding compliance with 32 C.F.R. § 861 exceed the scope of bid protest review.  Int.'s Mot. at 15 (citing *Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738, 755 (2006); *Chapman Law Firm*, 63 Fed. Cl. at 529).  Intervenor claims that "[w]hether Croman is ultimately able to obtain AMC approval following award is a matter of contract administration . . . th[is] determination[] occur[s] after the procurement is completed and so [is] not properly addressed through a procurement protest."  Int.'s Reply at 7 (internal quotations omitted).  In fact, Croman maintains that, because the question of whether Croman will become certified is left to the sole discretion of the AMC, the court may only determine whether the Navy "'acted reasonably based on the face of [an] offeror's proposal.'"  *Id.* (quoting *Precision Standard*, 69 Fed. Cl. at 755).  The United States agrees with Croman, and argues that the court may not examine whether intervenor will, in fact, eventually obtain AMC certification, but instead may only review the record and determine whether it provided a reasonable basis for the Navy's decision at the time of contract award.

Plaintiff disagrees with the notion that AMC approval is a matter of contract administration, rather than proposal evaluation.  Pl.'s Resp. at 15.  PHT points out that the Navy cannot grant AMC approval as a part of its administration of a contract, and that the determination of whether a contractor will be certified by that entity implicates federal statutes and regulations.  In addition, plaintiff notes that the Navy sent Croman an Evaluation Notice regarding its lack of AMC approval during the proposal evaluation stage.  PHT argues that this act by the Navy shows that certification is a challengeable evaluation issue.

On this matter, defendants are correct.  As Croman correctly points out, a number of decisions from this court, and from the Comptroller General, have addressed protests based on awardees' alleged inability to comply with solicitation

terms after award.  Many of those opinions have concluded that such protests present issues of contract administration.  *See Precision Standard*, 69 Fed. Cl. at 755 (explaining that an issue related to an awardee's compliance with a subcontracting limitation after award was "a matter of contract administration which the court does not review in the bid protest context"); *Chapman Law Firm*, 63 Fed. Cl. at 527-28 (same).  Accordingly, in the bid protest context, the court may only examine whether "a proposal, on its face, should lead an agency to the conclusion that an offeror could not and would not comply with" a solicitation's terms.  *Precision Standard*, 69 Fed. Cl. at 755 (internal quotations omitted) (holding that although the awardee's actual compliance with a limitation on subcontracting clause was a matter of contract administration beyond review, "the case law requires the court to consider whether the contracting officer acted reasonably based on the face of an offeror's proposal"); *Chapman Law Firm*, 63 Fed. Cl. at 527 ("Here, the court examines [the awardee's] proposal to determine whether it complied with the limitation on subcontracting requirement.").  The court is constrained to such a limited review because "[a]n agency's judgment regarding whether [an offeror] will comply with [a contract requirement] involves a responsibility determination, which is a matter committed to the discretion of the contracting officer."  *Precision Standard*, 69 Fed. Cl. at 755 (citing *Chapman Law Firm,* 63 Fed. Cl. at 527).  As the Comptroller General has explained, however, that facial review is critical:

> where a proposal, on its face, should lead an agency to the conclusion that an offeror could not and would not comply with [a contract requirement], we have considered this to be a matter of the proposal's technical acceptability; a proposal that fails to conform to a material term and condition of the solicitation . . . is unacceptable and may not form the basis for an award.

*Coffman Specialties, Inc.*, B-284546, B-284546.2, 2000 WL 572693, at *4 (Comp. Gen. May 10, 2000); *see Ecompex, Inc.*, B-292865.4, B-292865.5, B-292865.6, 2004 WL 1675519, at *4 (Comp. Gen. June 18, 2004); *KIRA, Inc.,* B-287573.4, B-287573.5, 2001 WL 1073392, at *3 (Comp. Gen. Aug. 29, 2001).

As indicated by the parties' briefing, most of the decisions relevant to this issue deal with proposed awardees' compliance with limitation on subcontracting clauses.  This court's recent decision in *SecureNet Co. Ltd. v. United States*, 72 Fed. Cl. 800 (2006), however, examined the principle of contract administration in

factual circumstances similar to those presented here.  In the court's view, the reasoning and ultimate holding in that case make it even more clear that, here, a review of the Navy's determinations regarding AMC certification is permissible.

In *SecureNet*, the plaintiff protested a contract award by the Army, arguing that the agency's evaluators had failed to consider whether the proposed staffing levels included in the awardee's proposal would ultimately comply with the overtime provisions of the law of South Korea, where the contract was to be performed.  *Id.* at 809.  Based upon its own analysis of the awardee's proposal, the plaintiff argued that the awardee could not comply with overtime limitations under Korean law, and that its "ratio of supervisors to hours required [was] thus an obvious flaw in its proposal."  *Id.* (internal quotations omitted).  The plaintiff alleged that the Army had violated its obligation to confirm the awardee's ability to comply with Korean law before making the award, even though it acknowledged that the solicitation's proposal evaluation criteria did not include such a requirement.  *Id.*  In support, the plaintiff pointed out that both the federal acquisition regulations, and a provision of the solicitation, instructed the contractor to comply with Korean law during performance.  Plaintiff contended that because the awardee's proposal ignored those material terms of the solicitation, it was ineligible for award.

The court disagreed with the plaintiff's contentions.  The court noted, as an initial matter, that the awardee had not taken exception to the solicitation's requirement to comply with Korean law, nor to the FAR provision which also mandated compliance.  Instead, the awardee's proposal had provided all of the information requested by the solicitation, in an effort to demonstrate its intent to comply with the relevant provisions.  *Id.* at 810.  The court then rejected the plaintiff's contention that the Army was obliged to confirm the awardee's compliance with Korean law.  The court explained that the FAR provision which mandated compliance with Korean law was "a special contract requirement found in Section H of the solicitation and describe[d] the obligations of contractors to comply with Korean labor law" once performance had begun.  *Id.*  Further,

> [t]he Clause states that a contractor's failure to comply with Korean labor law "may be deemed a breach or default of the contract and evidence of nonresponsibility."  A contractor's failure to remedy the violation may be "grounds for determining the contractor to be non-responsible for future Government contracts."

> The Clause is future-oriented . . . and any violation of the Clause
> would not be apparent until actual contract performance.  Indeed,
> the contract as awarded to [the awardee] fully requires [the
> awardee] to comply with Korean labor law or risk a possible
> default or non-responsibility determination.  Thus, as a preliminary
> matter, there would have been no occasion to assess . . .
> compliance with the Clause during the evaluation of proposals.

*Id.* (internal citations omitted).  The court determined that the only factors by
which the Army was required to evaluate proposals were those set forth in Section
M of the solicitation, none of which implicated compliance with Korean law or the
FAR.  *Id.* (stating that "the solicitation does not authorize the TEB to evaluate
offeror's [sic] ability to comply with the Korean labor laws, even though FAR
Clause 52.0000-4404 and Paragraph C.5.2 of the PWS requires such compliance
during performance").  Accordingly, the court concluded that the plaintiff's
argument improperly focused on a matter of contract performance.  *See id.*

Here, as in *SecureNet*, the original Solicitation set forth the requirement to
comply with the AMC regulation in its own Section H, entitled "Special Contract
Requirements."[13]  AR at 242.  However, the Solicitation also listed "the offeror's
possession of or plan of action to obtain AMC Certification" as an aspect of

---

[13]/  That section provides as follows:

> AMC CLAUSES
> H-1 Air Mobility Requirements
>
> (a)  Contractor is obligated to comply with generally accepted
> standards of airmanship, training, and maintenance practices and
> procedures.  Contractor must also satisfy DOD quality and safety
> requirements as described in 32 CFR Part 861, Section 861.3.  In
> addition, contractor shall comply with all provisions of applicable
> statutes, tenders of service, and contract terms as such may affect
> flight safety, as well as with all applicable Federal Aviation
> Administration Regulations, Airworthiness Directives, Orders,
> rules, and standards promulgated under the Federal Aviation Act
> of 1958, as amended.  Compliance with published standards may
> not, standing alone, constitute compliance with generally accepted
> standards of airmanship, training, or maintenance.

AR at 242.

proposals which would be reviewed by the Navy.  *See id.* at 280.  Further, after the Solicitation was revised, Section M placed an even heavier obligation on the Navy to examine offerors' efforts to meet the AMC certification requirement during its analysis of Technical proposals.  *Id.* at 1643, 1655 (stating that, "[i]f an offeror lack[ed] current AMC approval, its submission of the AMC Form 207, *DOD Statement of Intent*, [would] be evaluated to assess the likelihood of obtaining approval").  Because the Solicitation included this evaluation criterion, the question of whether an offeror would comply with the AMC requirement does not relate solely to contract administration after award.  *Cf. SecureNet*, 72 Fed. Cl. at 809-10.  It follows that the court may review whether the Navy properly evaluated that aspect of Croman's proposal.

It is true, of course, that Croman's ultimate certification under 32 C.F.R. § 861 is a matter of contract administration beyond the reach of the court.  The bid protest context undoubtedly does not permit the court to resolve that issue.  The court is entitled, however, to examine intervenor's proposal, and the Navy's evaluation thereof, to determine whether the agency was reasonable in concluding that Croman's proposal was acceptable on its face.  *Precision Standard*, 69 Fed. Cl. at 755.  In other words, the court must determine whether the agency complied with Section M's requirement that it assess the likelihood that Croman would obtain AMC certification upon award.  That inquiry overlaps significantly with PHT's challenge to the Navy's evaluation of intervenor's Technical proposal, which is addressed in the next section of this opinion.  Accordingly, these claims will be considered together.

### B.    Proposal Evaluations

### 1.    Croman's Technical Rating

At the heart of this protest is PHT's contention that the Navy erred when it concluded (1) that Croman's Technical proposal complied with the terms of the Solicitation and thus, was eligible for award and (2) that Croman's Technical proposal warranted a rating of "Outstanding/Low Risk," with no weaknesses.  In support of those broad assertions, plaintiff argues that the agency misconstrued information provided to it by intervenor and the AMC.  Such a claim hinges, of course, on the content of those communications.

### a.    Communications Related To AMC Certification

The record shows that Croman's first proposal, submitted in August 2005, stated as follows regarding AMC certification:

[].

AR at 716, 725.  In its revised proposal, Croman stated that

[].

*Id.* at 3799, 3807.  According to a March 1, 2006 Source Selection Evaluation Board (SSEB) Evaluation Plan, Navy employees Charles Myers and LT Shultz were assigned to review those statements, as part of the agency's effort to "[e]valuate the offeror's proposed <u>AMC Certification</u> approach for ability to comply with the Air Mobility Command (AMC) approval as per 32 CFR 861 or demonstrated ability to receive AMC approval after contract award through submittal of a completed AMC Form 207, DOD Statement of Intent." *Id.* at 1997, 2002.  In addition, the Navy asked the AMC to assist it in evaluating offerors' likelihood of certification.  The evidence shows that, on February 22, 2006, the Navy's Contracting Officer (CO) and SSEB Chair, Mr. Robin Barnes, sent an e-mail to AMC official Ms. Mary Reid, which advised her of the format of the planned evaluation.  *Id.* at 1911 ("Under our current construct, the AMC evaluation will be a 'risk' evaluation based on the submitted Form 207, if they do not already have AMC certification.  The risk evaluation categories are attached . . . .").  Mr. Barnes' e-mail also stated that

> [t]he purpose of the <u>*AMC Certification*</u> element is to allow the offeror to provide Air Mobility Command AMC approval as per 32 CFR 861 or demonstrate ability to receive AMC approval after contract award through submittal of a completed AMC Form 207, DOD Statement of Intent, with an assessment of the likelihood of obtaining approval and meet[ing] solicitation requirements, e.g. schedule.

*Id.*  The CO requested that Ms. Reid

> <u>complete worksheets for each offeror's Form 207 provided, i.e.,</u> <u>high risk assignment should indicate what the weaknesses are in</u> <u>their Statement of Intent that would make it likely that they would</u> <u>not receive certification and be able to perform our mission.  The</u>

37

> <u>assumption is that certification inspections would be able to take</u>
> <u>place based on your normal scheduling practices after notification</u>
> <u>of award.</u>

*Id.* (emphasis in original).  Mr. Barnes also attached a "Technical Appendix" to the e-mail which included a list of Risk Definitions, an "Evaluation Worksheet (Technical)," a "Rated Summary Sheet (Technical)," and some instructions.  *Id.* at 1914-19.

Ms. Reid returned the completed worksheets to the Navy on March 7, 2006. *Id.* at 1928-35.  On PHT's worksheet, Ms. Reid wrote, in a section titled [].  No weaknesses or deficiencies in plaintiff's proposal were noted.  *Id.*  Regarding Croman's proposal, Ms. Reid []

> [].

*Id.* at 1934.  Ms. Reid also submitted a chart which showed that PHT had been approved by AMC to transport DOD passengers in its medium and heavy lift helicopters, including the SK-61s that plaintiff had proposed to use in fulfillment of the Navy contract.  Croman, on the other hand, had no eligible helicopters.  *Id.* at 1931.

After Ms. Reid's evaluation was reviewed by the Navy, the agency issued Evaluation Notices (EN) asking offerors to respond to the AMC's concerns.   An EN to Croman dated March 8, 2006 stated as follows:

> [].

AR at 2262, 3145.  In the meantime, an SSEB Recommendation to the Source Selection Advisory Council dated April 10, 2006 and an SSEB Report dated April 17, 2006 indicated [].  In addition, Croman's proposal was assigned a Technical Proposal Risk of Low.  *Id.* at 2654, 2748.  A May 25, 2006 SSEB Report, in contrast, []

> [].

*Id.* at 2899.  The report repeated, however, the finding that intervenor's proposal presented only a Low Technical risk.  *Id.*

On June 2, 2006, Croman responded to the Navy's EN: []

[].

*Id.* at 3301.

On June 6, 2006, another AMC employee, Mr. Matthew Berry, re-evaluated Croman's proposal based on intervenor's response to the EN.  Mr. Berry found as follows:

[].

*Id.* at 1945.  Two days later, on June 8, 2006, the Navy's Technical Team Leader, Mr. Joe Brannan, completed a Technical Evaluation Worksheet for intervenor.  Mr. Brannan noted the weaknesses previously found in Croman's proposal by the AMC, []

[].

*Id.* at 2263.

Records created during the later stages of the Navy's proposal evaluations also acknowledged the fact that Croman lacked AMC approval.  For example, an Evaluation Issue Summary attached to the SSEB's June 13, 2006 Pre-Final Proposal Revision Report stated [].  Similarly, the SSAC's Final Evaluation Brief to the SSA stated that [].  Croman's Technical proposal was ultimately rated Outstanding/Low Risk.

### b.   The Parties' Contentions

Based on the foregoing information, PHT argues first that it was unreasonable for the Navy to conclude that Croman's proposal was facially compliant with the Solicitation's AMC requirement.  Plaintiff claims that, based on Croman's own representations regarding its flight experience, the Navy should have recognized that AMC could not grant a certificate to intervenor.  Plaintiff admits that, under 32 C.F.R. § 861, no set formula is used to determine whether applicants qualify for certification, and approval is committed to the sole discretion of the AMC.  PHT argues, however, that the discretion granted to AMC does not permit that entity to certify an applicant despite its failure to meet the baseline requirements set forth expressly in the AMC regulation.  Pl.'s Resp. at 15.  Plaintiff

39

states that, "[a]lthough the criteria are not 'inflexible,' AMC may not ignore its own regulations, and it is unlikely to accept Croman's passenger service in other aircraft as equivalent." *Id.* at 15 n.7. Thus, plaintiff claims that although the Navy could not make an ultimate conclusion regarding whether Croman would be certified, it could make a reasoned judgment, from intervenor's own statements, that certification was unlikely. From that information, PHT contends, the agency should have found intervenor's proposal non-compliant with the terms of the Solicitation.

Plaintiff also contends that the Technical rating assigned to Croman's proposal was erroneous, and that the Navy erred when it failed to treat Croman's lack of certification as a weakness in its proposal. PHT insists that the information contained in Croman's communications to the Navy did not justify a rating of Outstanding/Low Risk, because it revealed Croman's inability to obtain AMC approval before June 2007 at the earliest. Pl.'s Mot. at 29; Pl.'s Resp. at 28. PHT asserts that "simply because the Solicitation *allowed* an offeror to obtain AMC approval after award does not mean that the Navy cannot assign an appropriate Weakness and Risk to an offeror that will not have approval until after award, or lacks the required experience." Pl.'s Resp. at 13. In plaintiff's view, Croman's lack of AMC approval presented a major risk which should have resulted in a rating of Medium or High risk, and the assignment of a proposal weakness.

PHT has presented specific examples to show that the Navy misconstrued information from Croman and the AMC. First, plaintiff alleges that intervenor misled the Navy regarding its ability to become AMC certified. Pl.'s Mot. at 18-20. []. PHT insists that, given Mr. Berry's remarks, the Navy was on notice that Croman was unlikely to receive AMC approval, despite intervenor's assertions to the contrary.

PHT next alleges that Mr. Brannan's June 8, 2006 evaluation report drew a conclusion contrary to the information he had received from AMC. *Id.* at 21. Plaintiff points out that, when read carefully, Mr. Brannan's report acknowledges AMC's overall position that the weakness in Croman's proposal was "still valid." *Id.* (quoting AR at 2263). Plaintiff contends that Mr. Brannan improperly found, in spite of that representation by AMC, that Croman's proactive steps toward obtaining a certificate resulted in Low risk. *Id.* PHT argues that Mr. Brannan's conclusion was likewise inconsistent with AMC's individual communications, because

[].

[].

      In response, intervenor argues that the Navy properly evaluated the evidence presented regarding whether Croman could obtain certification, including the comments from AMC, and that the record supports the rating assigned to its proposal.  Int.'s Mot. at 22 (citing AR at 1934).  In fact, intervenor states that PHT has presented no more than a disagreement with the agency's evaluation, which is not a basis on which the court may interfere with the Navy's action.  *Id.* at 24.  In Croman's view, AMC found that Croman *was* eligible for certification, and was likely to complete the certification process quickly.  *Id.* at 19.  In support of that interpretation, intervenor highlights AMC's statement to the Navy that Croman had taken "proactive action" and had "resolved most [of the AMC's] concerns," and that only "minor issues" remained regarding Croman's application, all of which could be "quicky resolved."  *See* AR at 1934.  According to intervenor, "[t]his assessment by AMC directly contradicts PHT's claim that nothing in the record supports that AMC assessed a low risk for Croman."  Int.'s Reply at 13.  Intervenor also points out that, in an instance when AMC believed another carrier's experience was insufficient to secure its certification, AMC reported that concern to the Navy in explicit terms.  Int.'s Mot. at 20 (citing AR at 1937 [].

      Further, as a matter of policy, Croman argues that the AMC is in the best position to interpret its own regulation, and that its interpretation is entitled to substantial deference, given the flexible standard set out in 32 C.F.R. § 861.4(e).  In fact, based on the complexities of AMC certification, intervenor alleges that "final resolution of [the] issue by the agency charged with administering such requirements [] is particularly important."  Int.'s Reply at 11.  Croman insists that the Navy was entitled to rely on the conclusions from AMC, and thus, Mr. Brannan acted properly in concluding in June 2006 that "'AMC representative stated that weakness still valid however Offeror's proactive steps to achieve AMC Certification results in low risk.'"  Int.'s Mot. at 20 (quoting AR at 2263).  Finally, in response to PHT's contention that Croman's proposal was rated too highly, intervenor highlights the SSEB's report which identified five Technical strengths in Croman's proposal.  Intervenor insists that those aspects of the proposal justify the rating it received.  Int.'s Reply at 14-15 (citing AR at 3420).

The United States agrees with Croman that the Navy's Technical evaluation, and its determination that intervenor would likely comply with the AMC certification requirement, were reasonable.  Defendant points out that Croman met the Solicitation's explicit requirements regarding AMC certification, and took corrective action in response to the AMC's concerns.  Def.'s Mot. at 12 (citing AR at 1786-88).  In addition, the government asserts that AMC advised the Navy of a favorable evaluation, and the Navy was entitled to rely on it.  *Id.* at 13; Def.'s Reply at 9.  Defendant states that "[t]he Navy's interest in Croman's AMC certification was limited to the information that Croman was likely to obtain the certification in a reasonable period of time."  Def.'s Reply at 10.  Like Croman, the United States underscores AMC's comment that although "minor issues" remained regarding Croman's certification, all of them could be quickly resolved.  Def.'s Mot. at 12 (citing AR at 1934).  In addition, the government points to AMC's statement on June 6, 2006 that only "small issues" remained with Croman's Form 207 application.  *Id.* at 13 (citing AR at 1945).  Defendant insists that, because the relevant certifying authority found that only minor issues remained regarding Croman's AMC application, defendant's Outstanding/Low Risk assessment is supported by the record.  *Id.*  Moreover, the United States argues that the court may not substitute its judgment for that of the contracting agency, much less an independent governmental entity like AMC, which is charged with evaluating the very issue presented here.

Defendant also echoes Croman's assertion that AMC certification is only relevant to a small part of the contract, and that the Navy properly assigned a rating to Croman's proposal which also reflected its excellence in other areas relevant to the Technical evaluation.  The government insists that the Navy was entitled to determine which work was most important to the contract, and assign ratings accordingly, because an "agency's needs and the best method of accommodating them" are issues left to the sole discretion of a contracting agency.  Def.'s Mot. at 13.  The United States argues that, here, a potential lack of certification will not interfere with the work deemed most important by the Navy.  The government explains that, because the Solicitation offered an ID/IQ contract, the Navy will be required to issue task orders before any work is completed.  Def.'s Reply at 6.  Thus, defendant claims that, to the extent AMC certification is relevant, it will not prevent full performance unless and until the agency issues a task order directing Croman to transport DOD passengers.  *Id.* at 6-7.

### c.    Were the Navy's Conclusions Related to AMC

42

## Approval Reasonable?

PHT is correct that, under the terms of the Solicitation, the Navy was required to evaluate each offeror's likelihood of securing AMC certification. Section M of that document stated explicitly that "[i]f an offeror lack[ed] current AMC approval, its submission of the AMC Form 207, *DOD Statement of Intent*, [would] be evaluated to assess the likelihood of obtaining approval."[14] *Id.* at 1643, 1655; *cf. SecureNet*, 72 Fed. Cl. at 810. The record includes extensive documentation which shows that the Navy did, in fact, undertake that analysis. The parties have presented competing interpretations of the evidence which resulted from that endeavor. However, the alternative interpretations of the AMC's comments do not establish whether the Navy correctly assessed the information regarding Croman's AMC certification.

Fortunately, the question of whether the agency properly judged the technical acceptability of Croman's proposal is a relatively straightforward inquiry. Before delving into that matter, it is worth repeating that, in reviewing the evidence presented on these matters, the court may not substitute its judgment for that of the contracting agency. *Precision Standard*, 69 Fed. Cl. at 755; *Chapman Law Firm*, 63 Fed. Cl. at 527. Indeed, regarding the first question presented–whether the Navy correctly concluded that Croman's proposal was facially compliant with the Solicitation–the court must only determine whether the proposal, on its face, should have lead the agency to the conclusion that Croman "could not and would not comply with" the Solicitation's terms. *Precision Standard*, 69 Fed. Cl. at 755 (internal quotations omitted).

In the court's view, nothing contained in the administrative record should have led the Navy to conclude that Croman could not, or would not, ultimately

_____

[14]/ []. The court agrees with Croman. To the extent those errors occurred, they are *de minimus* errors in the procurement process which are not sufficient grounds upon which to overturn the award. *See Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed. Cir. 1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement."). On this record, there is ample evidence that the Navy completed the evaluation required under the Solicitation when it reviewed Croman's proposal. Indeed, as summarized above, the agency engaged in an extensive colloquy with both intervenor and the AMC in an effort to review Croman's Form 207 and to estimate intervenor's likelihood of certification.

become AMC certified.  Intervenor did not take exception to the AMC provisions of the Solicitation, but instead, provided all of the information requested of it on that matter.  *See SecureNet*, 72 Fed. Cl. at 810.  Further, during AMC's first evaluation, Ms. Reid acknowledged some problems with Croman's Form 207, but concluded that [].  Based on the comments as a whole, however, it is clear that the AMC's evaluations contained information sufficient to substantiate the Navy's ultimate conclusion that Croman's proposal was facially compliant with the AMC certification requirement.  *Precision Standard*, 69 Fed. Cl. at 755.

PHT's second contention based on the communications summarized above, that the Navy erred when it assigned a Technical rating of Outstanding/ Low Risk to Croman's proposal, requires a more detailed analysis.  It is well settled that a plaintiff bears a uniquely heavy burden when challenging such an evaluation. "Indeed, a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a 'best-value' procurement."  *Banknote*, 56 Fed. Cl. at 380; *see also LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed. Cir. 1995); *JWK Int'l Corp. v. United States*, 49 Fed. Cl. 371, 388 (2001).  The United States Court of Appeals for the Federal Circuit has explained that, to determine whether an agency's decision is rational,

> [t]he test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.

*Banknote*, 365 F.3d at 1351 (internal quotations omitted).  A decision may be deemed arbitrary and capricious only if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Manufacturers*, 463 U.S. at 43.

Further, "in cases such as this, when a negotiated procurement is involved and at issue is a performance evaluation, the greatest deference possible is given to the agency –what our Court has called a 'triple whammy of deference.'"  *Gulf Group Inc. v. United States*, 61 Fed. Cl. 338, 351 (2004) (quoting *Overstreet Electric*, 59 Fed. Cl. at 117 (characterizing the standard of review as "near

draconian")).  In other words, the deference afforded to an agency's decision must be even greater when a trial court is asked to analyze a technical evaluation. Indeed, "the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *see also Halter Marine, Inc. v. United States*, 56 Fed. Cl. 144, 158 (2003).  For this reason, the Court of Federal Claims will rarely second guess a technical evaluation decision by an agency. *See Information Sciences*, 73 Fed. Cl. at 104 (stating that the court "has been reluctant to micro manage the minutiae of a procurement to ferret out technical deficiencies"); *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002) ("This court will not . . . second guess the technical ratings that the source selection committee gave to each offeror."); *Acra, Inc. v. United States*, 44 Fed. Cl. 288, 293 (1999) (stating that "contracting officials have broad discretion . . . to determine which technical proposal best meets its needs").  Indeed, the court "is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of the evaluation" of Croman and PHT's proposals. *Compubahn, Inc. v. United States*, 33 Fed. Cl. 677, 682-83 (1995); *see also Electro-Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985) (stating that "where an agency's decisions are highly technical in nature . . . judicial restraint is appropriate and proper").  For these reasons, PHT bears a heavy burden to persuade the court that the Navy's technical evaluation was irrational. *Information Sciences*, 73 Fed. Cl. at 104.

Here, in the court's view, the comments from AMC support the Navy's evaluation of Croman's Technical proposal, when they are considered along with the other relevant parts of the record.  [].  It is critical to recognize, however, that the manner in which such comments should be interpreted, during the course of a technical evaluation, is left to the discretion of the contracting agency.  Indeed, so long as the Navy's interpretation of those comments was reasonable, it must be upheld. *See and compare ORCA Northwest Real Estate Servs. v. United States*, 65 Fed. Cl. 1, 6 n.10 (2005) ("Although ORCA presents many factual explanations, clarifications, and restatements in an effort to prove the erroneous nature of HUD's evaluative conclusions, there has been no showing that these conclusions lacked a rational basis. . . .  In the absence of a compelling showing by ORCA, this court is neither equipped nor empowered to look beyond the rationale contained in the record."); *Hydro Eng'g, Inc. v. United States*, 37 Fed. Cl. 448, 467 (1997) (court refused to disturb agency's determinations, noting that "[t]echnical ratings are

aspects of the procurement process involving discretionary determinations of procurement officials which a court should not second guess"). Here, several specific comments from AMC indicated that Croman would obtain certification with just a few small adjustments to its application. Despite other criticisms about Croman contained in the comments, those comments do provide a "coherent and reasonable explanation" for the agency's decision on this matter. *Banknote*, 365 F.3d at 1351 (internal quotations omitted). It follows that the Navy acted reasonably when it relied on those remarks to conclude that Croman's proposal presented only a Low Technical risk.

Furthermore, it is important to note that, contrary to PHT's suggestions, the rating assigned to Croman's proposal did not reflect an impeccable evaluation by the Navy. []. Based on those statements, among other things, the Navy assigned a Low risk rating to intervenor's proposal. Under the definitions included in the Solicitation, a Low proposal risk rating indicates that a proposal "[h]as little or no potential to cause disruption of schedule, increase in cost, or degradation of performance. Normal contractor effort will probably be able to overcome difficulties." AR at 1784. That rating, in other words, may be used in circumstances in which some amount of risk is present in an offeror's proposal. In the court's view, that rating adequately reflected the small risk, evident in the comments from AMC, that Croman might not become certified within the relevant time. Moreover, even if the court were to find a different rating to have been more appropriate, there can be no doubt that the court may not substitute its own judgment for that of the contracting agency. *Grumman Data Systems*, 15 F.3d at 1046.

Finally, and perhaps most importantly, Croman is correct to point out that the Navy's Technical evaluation was not focused exclusively on AMC certification. Instead, the Technical evaluation addressed several aspects of the offerors' proposals, including "the breadth and depth of understanding of the complexity of each type of mission addressed" and, more specifically,

> *possession of or plan of action to obtain AMC certification, use of GFE in the missions such as the pole, basket, fire fighting equipment and launch mission; as well as the ability to meet or exceed aircraft performance characteristics (e.g., speed/altitude, time on station, configuration/special equipment, and internal capacity), the proposed management of scheduled and unscheduled maintenance and impact to the fleet . . . proposed*

> *pilot and crew FAA qualifications and availability to meet mission requirements.*

AR at 1783.  It is clear, therefore, that the likelihood of AMC certification was only one of several considerations which led to the Navy's conclusion that Croman's proposal presented only a Low risk of non-performance.  Plaintiff has attempted to show that passenger transport comprised a large portion of the work to be completed under the challenged contract, and thus, that the AMC certification issue should have been given the most weight by the Navy in its Technical evaluation.  On the record presented, however, it is impossible to determine with any certainty what percentage of this contract will ultimately be comprised of passenger transport work.  Further, the history and purpose of the H-3 Squadron, which is to be replaced by this procurement, and the Squadron's Range Mission Manual's description of passenger transport work as "periodic" all indicate that transport of DOD passengers will not be one of the ultimate awardee's main functions.  *See* AR at 1443.  On the record as a whole, the only reasonable conclusion is that passenger transport work will comprise a relatively small part of the contract at issue.  It was reasonable, therefore, for the Navy to determine that the AMC certification aspect of each proposal should carry relatively little weight in overall Technical evaluations.  The five Technical strengths assigned to Croman's proposal provide support for the rating ultimately assigned.

In sum, the court finds no reversible error in the Navy's conclusion that Croman's proposal was technically acceptable, or the rating assigned to Croman's proposal.  The Navy was entitled to rely on comments from AMC regarding the likelihood that intervenor would obtain certification under 32 C.F.R. § 861.4(e), and the agency acted reasonably when interpreting and applying those comments in its evaluation of Croman's proposal.  Moreover, AMC certification comprised only a small part of the agency's Technical evaluation.  For these reasons, the Navy's assignment of an Outstanding/Low risk rating to intervenor's proposal was neither arbitrary nor capricious.  In light of the substantial deference afforded to contracting officers' evaluations of technical proposals, the Navy's determinations on this matter must be upheld.  *E.W. Bliss*, 77 F.3d at 449; *Gulf Group*, 61 Fed. Cl. at 351.

## 2.    Croman's Experience Rating

Plaintiff argues next that the Navy improperly evaluated the Experience

section of Croman's proposal, because it gave "undue consideration to the experience of CSC, Croman's large business subcontractor, in violation of the Solicitation." Pl.'s Mot. at 31.  In support of that contention, plaintiff notes that, although the Solicitation provided for the evaluation of subcontractors' and critical team members' experience, it instructed that "[p]articular emphasis [would] be placed on the offeror's experience," and "on the offeror's possession of a plan of action to obtain AMC certification." *Id.* at 31-32 (citing AR at 1783).  Plaintiff claims that the Navy ignored Croman's lack of experience with Navy target launch and retrieval and the transport of DOD personnel (as demonstrated by its lack of AMC approval), and instead placed "particular emphasis" on CSC's experience. *Id.* at 32.

PHT complains, specifically, that the Navy improperly assigned a strength to Croman's proposal based on intervenor's "[e]xtensive team member experience in [project] related efforts." *Id.* at 33 (citing AR at 3412); *see also* Pl.'s Resp. at 29. []. Pl.'s Mot. at 34.  PHT argues that the Navy's reliance on CSC's experience was especially unreasonable given that the contract had been set aside for small businesses. *Id.* at 32.

Plaintiff also disputes the strength assigned to Croman's proposal for "[s]ignificant personnel experience in PMRF Operations Area with relevant mission experience." *Id.* at 33 (quoting AR at 3412).  PHT argues that this strength was not warranted, [].  Emphasizing again that "[t]he Solicitation required particular emphasis on the *offeror's* experience, including 'experience in . . . utilization of qualified personnel,'" plaintiff insists that Croman has no experience with the utilization of qualified personnel for Navy range operations. *Id.* (internal citation omitted) (quoting AR at 1783) (emphasis in original).  For all of these reasons, PHT urges the court to find that the Navy relied on improperly assigned strengths to advise the SSA that "Croman's demonstrated experience, particularly with regard to PWS mission performance . . . enable[d] Croman to perform with a very low risk of interruption or aircraft incidents, and with no mission area learning curve concerns."[15] *Id.* at 34 (quoting AR at 3507).

---

[15]/ PHT also argues that the improvement in Croman's Experience rating between the first and second reviews was unjustified, given that intervenor lacked AMC certification during both evaluations.  In fact, plaintiff contends that Croman should have received a less favorable Experience risk rating than it did, "because the risk that this lack of Experience would interfere

(continued...)

In response, the United States and Croman contend that it was rational for the Navy to consider CSC's management experience and specialized skills when rating intervenor's proposal, and that plaintiff has presented no more than a disagreement with the agency's Experience evaluation.  Def.'s Mot. at 15-16.  In fact, defendants argue that plaintiff's argument is contrary to the terms of the Solicitation and the evidence as a whole.  Defendants point out that the Solicitation specifically anticipated the use of subcontractors, and advised offerors to present evidence on their subcontractors' experience.  *See* Def.'s Mot. at 15; Int.'s Mot. at 28; Int.'s Reply at 15.  Because Croman properly proposed to use CSC as a subcontractor, and the Solicitation expressly permitted the Navy to consider the experience of proposed subcontractors and assign proposal strengths based thereon, Croman asserts that the Navy acted reasonably when it relied on CSC's experience to reach its conclusions.  In fact, the United States contends that it would have been arbitrary for the agency to penalize Croman for its proposed subcontract with CSC.  Def.'s Mot. at 16.  In response to the claim that reliance on CSC's experience was inappropriate during the course of a small business set-aside procurement, defendants point to the SBA's determination that Croman's relationship with CSC did not jeopardize its status as a small business.  Based on the SBA's findings, the government insists that "particular emphasis" could properly be placed on both entities' experience.  Def.'s Mot. at 17 (citing AR at 3689-96); Def.'s Reply at 12; Int.'s Mot. at 28.  Finally, intervenor points out that because this was a negotiated procurement, the Navy was entitled to wide discretion in evaluating proposals.

As the parties' briefing makes clear, the question of whether the Navy properly evaluated Croman's Experience begins with the language of the

---

[15](...continued)
with performance of the PWS requirements was certain."  Pl.'s Mot. at 34.  The court agrees with the United States, however, that absent an allegation of bad faith on the part of the Navy, a comparison of the first and second evaluations is not relevant.  This is not a case in which two evaluations of identical proposals resulted in differing assessments.  To the contrary, the record is clear that here, the Navy's second evaluation was based on different versions of the Solicitation and of each offeror's proposal, and was conducted by a different evaluation team. *Cf. Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 599 (2006).  Moreover, the fact that the first evaluation did not comport with the methodology set forth in the original Solicitation makes a comparison even less appropriate.  Accordingly, because PHT has made no allegation of bad faith, the arguments which rely on a comparison between the first and second evaluations will not be considered.

Solicitation.  That document stated the following with regard to Experience:

> *The Government will evaluate the offeror's, and (if applicable), its principal subcontractors' and critical team members' demonstrated relevant experience on the basis of its breadth and depth of experience performing the type of work required to meet program objectives.  Particular emphasis will be placed on the offeror's experience in coordinating with Government program and contracting teams, managing subcontractors, management of assets and resources to ensure successful completion of missions, and utilization of qualified personnel (including the use of FAA certified pilots) for contract performance, and performing tasks as described in the PWS.*

AR at 1783.  PHT argues that the phrase "particular emphasis" primarily modified the term "offeror's," and so, the Solicitation is properly interpreted to mean that the Navy was required to focus principally upon an offeror's own experiences rather than those of its subcontractors and team members.  Plaintiff asks the court to conclude, in other words, that the experience of each offeror should have been given the greatest weight in the Navy's evaluation.  Defendants retort that, as written, the first sentence of this provision explicitly authorized the agency to consider the experience of offerors *and* proposed subcontractors and team members.

Both of these assertions are valid.  Plaintiff is undoubtedly correct that the plain language of the Solicitation instructed the Navy to place "particular emphasis" on offerors' experience.  *See id.*  In fact, the provision omitted the clause, included in the first sentence of this section of the Solicitation, that offerors' experience would be deemed to include the experience of its proposed subcontractors and critical team members.  *Id.*  Those facts support PHT's position that the experience of Croman itself, rather than that of CSC, should have been weighted most heavily by the Navy.  *Cf. Comprehensive Health Servs., Inc. v. United States*, 70 Fed. Cl. 700, 733 (2006) (stating that because the solicitation did not specify that an offeror's prior experience was to be given more weight than its subcontractors' prior experience, the agency acted properly when it relied on the prior experience of a proposed subcontractor); *Overstreet Electric*, 59 Fed. Cl. at 101 (stating that "[t]he solicitation did not mandate giving greater weight to past relevant jobs performed by the bidder solely as a prime contractor").  To interpret the phrase "particular emphasis" accurately, however, the court must consider it in

the context in which it appears in the Solicitation. *Banknote*, 365 F.3d at 1353 (stating that the court must "consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions"). In other words, the remainder of the sentence in which the challenged phrase appears is equally important to the Solicitation's meaning. *See and compare Overstreet Electric*, 59 Fed. Cl. at 116 (stating that "the plain language . . . must be placed in its proper context so as to give it and all parts of the solicitation a reasonable meaning that avoids a wooden literalism that contravenes the spirit and purpose of the solicitation") (internal quotations omitted). Here, the disputed provision of the Solicitation, read in its entirety, stated that "particular emphasis will be placed on the offeror's experience in *coordinating* with Government program and contracting teams, *managing* subcontractors, *management* of assets and resources to ensure successful completion of missions, and *utilization* of qualified personnel . . . for contract performance, and *performing* tasks as described in the PWS." AR at 1783 (emphasis added). In the court's view, the list of specific project tasks which followed the phrase "particular emphasis" indicates that the term was used to identify the *aspects* of Experience which would be given the most weight by the Navy, and not merely to identify the source of information which would be treated as most important. That fact undermines the persuasiveness of plaintiff's suggested interpretation.

Further, and more importantly, even if the court were to assume that PHT's interpretation of the Experience clause is correct, there is no evidence here that the Navy evaluated offerors' Experience improperly. Clearly, Croman's Experience rating was based in part on information about CSC. []. It is also true, however, that the Navy assigned three *other* Experience strengths to Croman's proposal based on intervenor's own history. *Id.* Because three of the five strengths which led to Croman's rating were derived from intervenor's own experience, rather than that of CSC, the court finds that the Navy complied with the Solicitation's mandate to place "particular emphasis" on the experience of offerors as opposed to subcontractors. *See id.* at 1783. This determination is, however, as far as this court is authorized to delve with respect to PHT's concerns in this regard. Again, the court is not in a position to examine the individual merit of the strengths assigned to Croman's proposal. *See E.W. Bliss*, 77 F.3d at 499.

It cannot be disputed that agencies are entitled to wide discretion to evaluate and rate proposals as a part of a best value determination. *Overstreet Electric*, 59 Fed. Cl. at 117 (stating that "Overstreet must overcome a triple whammy of

deference by demonstrating by a preponderance of the evidence that the SSA lacked *any* rational basis to grade [the awardee] as 'Exceptional'") (emphasis in original); *Banknote*, 56 Fed. Cl. at 380.  Indeed, the court is required to defer to agency decisions on matters of proposal evaluation absent a showing that a particular finding was arbitrary, capricious, or otherwise contrary to law.  *See Overstreet Electric*, 59 Fed. Cl. at 117.  Here, the Navy complied with the evaluation method set forth in the Solicitation to conclude that Croman's proposal presented a small advantage in Experience as a result of intervenor's relationship with CSC, and other aspects of Croman's own history.  Because the Navy's evaluation and rating of Croman's proposal was rational, and supported by the record, it was neither arbitrary, capricious, an abuse of discretion, nor otherwise contrary to law.

### 3.    Weakness in PHT's Experience

Plaintiff argues that the Navy acted arbitrarily and capriciously when it found that PHT "lack[ed] experience in heavy lift target recovery, target launch mission and medium target recovery lift missions," and therefore "corporately lack[ed] experience in managing and performing some of the PWS missions." Pl.'s Mot. at 35 (quoting AR at 3505).  Plaintiff contends that this finding, and the assignment of a weakness to the Experience section of its proposal, were unreasonable.  In support of that claim, PHT states that it currently employs former Navy pilots who have substantial experience with target launch and recovery. Plaintiff also points out that, according to the Navy's debriefing, a PHT Experience strength was "Pilots and aircrew have relevant Navy experience performing same missions as required in PWS."  Pl.'s Mot. at 36 (citing and quoting AR at 3723-37).  Thus, plaintiff argues that, to the extent the Navy considered personnel experience during its Experience evaluation, the proposals from PHT and Croman were no different from one another.  *Id.*  Further, according to plaintiff,

[].

*Id.* (citing and quoting AR at 3507, 4184-85) (internal citations omitted).  Finally, PHT argues that target launch and recovery are not complex or costly aspects of the work sought by the Navy, and so, any weakness in its proposal related to those areas should have carried little weight in the agency's analysis of proposals.  *Id.* at 35-36.  To support that assertion, plaintiff highlights the SBA's determination that the target recovery work which CSC was to perform on Croman's behalf would

constitute only 3% of the contract's value.

Intervenor responds by arguing that the Navy's determinations regarding PHT's Experience were reasonable and supported by the record. Int.'s Mot. at 29. Croman notes first that the Navy repeatedly identified a weakness in plaintiff's proposal, related to target launch and recovery, during the evaluation process. *Id.* (citing AR at 2164, 2172, 2176). In fact, as intervenor underscores, the agency's apparent concern about plaintiff's lack of experience related to those tasks led the Navy to conduct discussions with PHT. Croman argues that PHT's responses to discussion questions confirmed the Navy's suspicion that plaintiff lacked experience with target launch and recovery, and so, resulted in the eventual assignment of a weakness to plaintiff's proposal. *Id.* at 30 (citing AR at 3176, 3415, 3455, 3505, 3513). Croman argues further that the Navy did, in fact, credit plaintiff for its plan to employ experienced personnel, and that PHT received a rating of Low risk, rather than Moderate risk, as a result of that aspect of plaintiff's proposal. Finally, Croman contends that the SBA's findings are irrelevant to the Experience evaluation, as the Navy has the exclusive right to determine which aspects of a procurement are most important to its award decision.

On this point, the court agrees with Croman. The record shows that the Navy conducted an extensive evaluation of PHT's Experience, including but not limited to its past target launch and recovery work. Further, although PHT apparently alleges that it was surprised by the assignment of a weakness to its second proposal, the evidence belies that contention. Indeed, there is no question that the Navy engaged in adequate discussions with plaintiff regarding its experience with target launch and recovery. The record is uncontroverted that, when the Navy evaluated the revised proposals, PHT's lack of prior experience in those areas was addressed promptly by agency personnel. In an evaluation dated May 17, 2006, for example, the Navy found as follows:

[].

AR at 2176; *see also id.* at 2164, 2167, 2172-73, 2177-78, 2181, 2184 (reporting similar findings). As a result of these concerns, the Navy sent ENs to plaintiff which []. By allowing PHT to respond to the Navy evaluators' concerns, the agency satisfied the requirement that it afford plaintiff an opportunity to respond to

the weakness identified in its proposal.[16]  48 C.F.R. § 15.306(d)(3) (2005).

Regarding PHT's more direct contention that the assignment of a weakness to its proposal was unreasonable, it bears repeating that this court is not permitted to second guess the Navy's judgment in that regard.  *E.W. Bliss*, 77 F.3d at 449. Indeed, there can be no doubt that the court is prohibited from substituting its judgment for that of a contracting agency regarding the merits of an offeror's proposal.  *Overstreet Electric*, 59 Fed. Cl. at 17-18.  Further, it is appropriate to note that, when the Navy determined that PHT's proposal was weak in the areas of target launch and recovery, the agency acknowledged the experience plaintiff had gained as a result of its past relevant contract, but concluded that the experience was insufficient, given its relatively short duration.  *See* AR at 3415.  In light of such a reasonable explanation for the agency's conclusion, it cannot be said that the Navy failed to present "a rational connection between the facts found and the choice made."  *Motor Vehicle Manufacturers*, 463 U.S. at 43 (internal quotations omitted).  Accordingly, the Navy's findings on this matter must not be disturbed. The court concludes that the Navy's assignment of a weakness to PHT's proposal, in the area of target launch and recovery, was neither arbitrary, capricious, an abuse of discretion, nor otherwise contrary to law.

### 4.    The Navy's Best Value Determination

Last, PHT argues that the Navy's best value determination was arbitrary and capricious, and that the agency evaluated proposals improperly to justify an award to Croman.  These broad contentions rest, of course, on plaintiff's specific complaints that Croman's Experience and Technical proposal ratings were erroneous, and that Croman's alleged advantage in Experience was based on an unreasonably assessed weakness in PHT's proposal.  PHT insists that, even if Croman has more experience than PHT with target launch and recovery, that advantage was offset by Croman's lack of experience with passenger transport. Plaintiff claims that "[a]t minimum, the risk of Croman's inability to perform

---

[16]/  Plaintiff also complains that the Navy's assignment of this proposal weakness during the second evaluation directly contradicts the results of the first evaluation, in which no such weakness was identified.  As explained above, however, plaintiff's arguments which rely on a comparison of the two sets of evaluations will not be considered in the absence of an allegation that the agency acted in bad faith.

critical tasks of the PWS equalizes any risks and weaknesses between Croman and PHT, which would have made PHT's lower price the determinative factor in the Best Value analysis."[17]  Pl.'s Mot. at 31.  Plaintiff claims that while both offerors were assigned proposal strengths based on their proposed personnel, the SSA was improperly led to believe that Croman alone possessed that experience.  In addition, PHT states that the SSA was improperly led to believe that both were "essentially equal" in Technical ratings, despite Croman's lack of AMC approval.  Pl.'s Resp. at 28.

In response, defendants argue that the Navy's best value determination was reasonable and fully supported by the record.  Croman contends, for example, that each individual evaluation score assigned by the agency was reasonable, and that those scores were used properly to reach the Navy's ultimate award decision.  In addition, the United States points out that while PHT submitted the lowest price during the second evaluation, the Navy was not required to treat that fact as outcome determinative, because the Solicitation explicitly stated that non-price factors were "significantly more important" to the agency's decision than price, with Experience being the most important factor.  Def.'s Mot. at 18 (quoting AR at 1782).  Defendant and Croman underscore that, during the first evaluation, Croman submitted the lowest bid, but neither fell below the independent government estimate for the work.  During the second evaluation, however, both offerors' bids fell below that estimate.  Thus, defendants contend, the Navy was able to exercise its discretion reasonably in choosing a proposal which did not include the lowest price, but which nonetheless undercut the price which the Navy had determined to

---

[17]/  Plaintiff also argues that the Best Value Tradeoff analyses performed by the Navy were contradictory.  PHT notes that, during the October 6, 2005 Best Value Tradeoff, the Navy found the benefit from Croman's Experience to be "much like" the benefit from PHT's Experience, and not worth the payment of a price premium.  Pl.'s Mot. at 38 (quoting AR at 1247).  During the second Best Value Tradeoff, however, the agency concluded that Croman's advantage in Experience did justify a premium of approximately 4%, or $2.3 million.  *See id.* (citing AR at 3507).  Plaintiff claims that the inconsistencies in those conclusions show that the award to Croman was unreasonable, and that "[t]he Navy recognized that the Experience of Croman and PHT was essentially the same and that any slight advantage that Croman might have in this area was not worth a price premium.  It was not until PHT submitted the lower price that the Navy decided otherwise."  *Id.* at 39.  In the court's view, these arguments add little to PHT's overarching challenge to the Navy's best value determination.  Again, absent an allegation of bad faith, a comparison of the results of the two evaluations would be inappropriate.

be a reasonable fee for the work sought.  Moreover, PHT's final price was only 4% lower than that submitted by Croman.  The government argues that this small savings offered by PHT's proposal was outweighed by the significant improvement in Experience offered by Croman.  The United States and Croman insist that the agency was entitled to make such a trade-off, under the terms of the Solicitation, and that the SSA's decision to do so, which was explained thoroughly in the record, supports the Navy's best value determination.  Finally, the government emphasizes that, while plaintiff's arguments focus on AMC certification, the Navy's decision to entertain proposals from uncertified companies shows that the agency placed little importance on offerors' passenger transport capabilities.  Def.'s Reply at 13.  According to defendant, "because the other, more technically demanding, support functions were of paramount importance to the Navy, the possibility of there being a delay in Croman's passenger transport capabilities did not detract significantly from its proposal."  *Id.* at 10.  Defendant states that "[e]ven assuming . . . that Pacific Helicopter's AMC Certification was an advantage over Croman, it was an advantage that the Navy did not value, at least not more than it valued the management experience provided by Croman."  *Id.* at 14.

Before examining the parties' contentions on this issue, it cannot be stated strongly enough that "[e]ffective contracting demands broad discretion."  *KSD, Inc. v. United States*, 72 Fed. Cl. 236, 253 (2006) (quoting *Burroughs Corp v. United States*, 617 F.2d 590, 598 (Ct. Cl. 1980)).  For that reason, "[p]rocurement officers, especially those who procure by negotiation, are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government."  *Tidewater Mgmt. Servs., Inc. v. United States*, 573 F.2d 65, 73 (Ct. Cl. 1978).  Indeed, "[t]he wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals."  *Halter Marine*, 56 Fed. Cl. at 159.  Further, in a case such as this one, in which a best value determination is at issue, "the agency has greater discretion than if the contract were to have been awarded on the basis of cost alone."  *Park Tower Mgmt., Ltd. v. United States*, 67 Fed. Cl. 548, 566 (2005) (citing *E.W. Bliss*, 77 F.3d at 449)).  Finally, there is no question that "[b]est value awards allow the Government to accept other than the lowest priced proposal where the perceived benefits of the higher priced proposal merit the additional costs."  *B & S Transp., Inc. v. United States*, 68 Fed. Cl. 103, 107 (2005) (citing 48 C.F.R. § 15.101-1(c) (2005)).  For all of these reasons, a plaintiff who challenges a negotiated procurement, in which a contracting officer has

"engage[d] in what is inherently a judgmental process," bears a particularly heavy burden to show that the contracting agency acted in a manner which was arbitrary and capricious. *Galen Medical Associates*, 369 F.3d at 1330 (internal quotations omitted).

Here, the court agrees with defendant that the administrative record sets forth a detailed and persuasive explanation for the Navy's award decision. After the second evaluation, the Source Selection Advisory Council made the following findings regarding its best value determination:

[].

AR at 3507. This information was conveyed to the agency's SSA, James A. Meade, who reiterated, elaborated upon, and concurred with each of the SSAC's specific conclusions about why Croman's proposal presented the best value to the government. *Id.* at 3521-23. Each of the specific findings set forth in the SSAC's report are supported by independent evidence in the record. For example, plaintiff challenges the SSAC's statement that Croman and PHT's proposals were "essentially equal" regarding the Technical factor. However, that conclusion rests soundly on the fact that, []. Because the Navy's Technical evaluation implicated many aspects of offerors' proposals, it was reasonable for the SSAC []. Further, the fact that Croman's price was slightly higher than PHT's during the second evaluation lends little support to plaintiff's claim because, at that point, both offerors had proposed to fulfill the contract for less than the Navy had expected to pay for it. In addition, the Solicitation explicitly permitted the agency to award the contract to an offeror which had not proposed the lowest price, if its proposal was deemed the most advantageous to the government. *See* AR at 1781. Thus, the Navy was entitled to conclude that, although PHT had submitted the lowest priced proposal, Croman's proposal nevertheless presented the best overall value to the government. *B & S Transport*, 68 Fed. Cl. at 107. And finally, plaintiff's contention that Croman's advantage in target launch and recovery experience was outweighed by its own superior experience with passenger transport is exactly the sort of value judgment which must be left to the discretion of the contracting agency. *Halter Marine*, 56 Fed. Cl. at 159. Based on the Navy's detailed explanation of its best value determination, and its reasoned evaluation of proposals, the court concludes that the Navy's award decision was fully supported by the record. It follows that the decision was neither arbitrary nor capricious, and it must be upheld.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** as follows:

(1)    Plaintiff's Motion for Judgment on the Administrative Record, including all of its requests for injunctive and declaratory relief, filed October 10, 2006, is **DENIED**.  The Cross-Motions for Judgment on the Administrative Record, filed by Defendant and Intervenor-Defendant on October 23, 2006, are **GRANTED**;

(2)    The Clerk's Office is directed to **ENTER** final judgment dismissing the complaint with prejudice in this action;

(3)    On or before **January 2, 2007**, counsel for each party shall file with the Clerk's Office a redacted copy of this opinion, with any material deemed proprietary marked out in brackets, so that a copy of the opinion can then be prepared and made available in the public record on this matter; and

(4)    Each party shall bear its own costs.

/s/ Lynn J. Bush
LYNN J. BUSH
Judge